USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT ____________________ No. 94-1562 CITIZENS AWARENESS NETWORK, INC., Petitioner, v. UNITED STATES NUCLEAR REGULATORY COMMISSION, Respondent. ____________________ YANKEE ATOMIC ELECTRIC COMPANY, Intervenor. ____________________ ON PETITION FOR REVIEW OF A DECISION OF THE  UNITED STATES NUCLEAR REGULATORY COMMISSION ____________________ Before Torruella, Chief Judge, ___________ Aldrich, Senior Circuit Judge, ____________________ and Cyr, Circuit Judge. _____________ _____________________ Jonathan M. Block, with whom Robert L. Quinn and Egan, __________________ _________________ _____ Flanagan and Cohen, P.C. were on brief for petitioner. ________________________ Charles E. Mullins, Senior Attorney, Office of the General __________________ Counsel, U.S. Nuclear Regulatory Commission, with whom Karen D. ________ Cyr, General Counsel, John F. Cordes, Jr., Solicitor, E. Leo ___ ____________________ ______ Slaggie, Deputy Solicitor, U.S. Nuclear Regulatory Commission, _______ Anne S. Almy, Assistant Chief, and William B. Lazarus, Attorney, _____________ __________________ Appellate Section, Environment and Natural Resources Division, U.S. Department of Justice, were on brief for respondent. Thomas G. Dignan, Jr., with whom Ropes & Gray, was on brief _____________________ ____________ for intervenor. ____________________ July 20, 1995 ____________________ TORRUELLA, Chief Judge. Citizens Awareness Network TORRUELLA, Chief Judge _______________________ ("CAN") petitions for review of a final order and opinion of the United States Nuclear Regulatory Commission ("NRC" or "the Commission") denying CAN's request for an adjudicatory hearing regarding decommissioning activities taking place at the Yankee Nuclear Power Station ("Yankee NPS"). CAN's petition for review rests on three grounds. First, CAN contends that the Commission's order violates CAN members' right to due process under the Fifth Amendment and 189a of the Atomic Energy Act ("AEA"), 42 U.S.C. 2239 (1988). Second, CAN argues that the NRC's action violates the National Environmental Policy Act, ("NEPA"), 42 U.S.C. 4321 et seq. (1988) by failing to conduct __ ___ an environmental analysis ("EA") or an environmental impact statement ("EIS") prior to decommissioning. Finally, CAN argues that the Commission's actions violate its own precedents and regulations, in violation of the Administrative Procedure Act ("APA"), 5 U.S.C. 501 et seq. Although we reject CAN's Fifth __ ___ Amendment arguments, we grant CAN's petition for review on the other grounds stated. BACKGROUND BACKGROUND A. The Regulatory Framework A. The Regulatory Framework ________________________ Operators of nuclear power plants must have a license issued by the NRC. That license describes the facility and the authorized activities that the operator may conduct. If the operator, called the "licensee," wishes to modify the facility or take actions not specifically authorized by the license, the -2- licensee may seek an amendment to its license from the Commission. See 42 U.S.C. 2131-2133, 2237 (1988). ___ Section 189a of the AEA provides that: In any proceeding under this chapter, for the granting, suspending, revoking, or amending of any license or construction permit, or application to transfer control, and in any proceeding for the issuance or modification of rules and regulations dealing with the activities of licensees, . . . the Commission shall grant a hearing upon the request of any person whose interest may be affected by the proceeding, and shall admit any such person as a party to such proceeding. . . . 42 U.S.C. 2239(a)(1)(A). The Commission has issued regulations specifically allowing a licensee to modify its facilities without NRC supervision, unless the modification is inconsistent with the license or involves an "unreviewed safety question." 10 C.F.R. 50.59(a)(1). If the proposed change is inconsistent with the license, or does involve an unreviewed safety question (as that term is defined in 10 C.F.R. 50.59(a)(2)(ii)), the licensee must apply to the Commission for a license amendment, 10 C.F.R. 50.59(c), and only then are the statutory hearing rights of 189a triggered. The procedures for decommissioning1 a nuclear power plant are set forth principally in 10 C.F.R. 50.82, 50.75, 51.53, and 51.95 (1990). The formal process begins with the  ____________________ 1 "Decommissioning" means those activities necessary "to remove [a facility] safely from service and reduce residual radioactivity to a level that permits release of the property for unrestricted use and termination of the license." 10 C.F.R.  50.2; 53 Fed. Reg. 24018, 24021 (June 27, 1988).  -3- filing of an application by the licensee, normally after the plant has ceased permanent operations, for authority to surrender its license and to decommission the facility. Five years before the licensee expects to end plant operations, the licensee must submit a preliminary decommissioning plan containing a cost estimate for decommissioning and an assessment of the major technical factors that could affect planning for decommissioning. 10 C.F.R. 50.75. Within two years after "permanent cessation of operations" at the plant, but no later than one year prior to expiration of its license, a licensee must submit to the Commission an application for "authority to surrender a license voluntarily and to decommission the facility," together with an environmental report covering the proposed decommissioning activities. 10 C.F.R. 50.82, 50.83. This application must be accompanied by the licensee's proposed decommissioning plan, which describes the decommissioning method chosen and the activities involved, and sets forth a financial plan for assuring the availability of adequate funds for the decommissioning costs. 10 C.F.R. 50.82(b). The Commission then reviews the decommissioning plan, prepares either an environmental impact statement ("EIS") or an environmental assessment ("EA") in compliance with NEPA, and gives notice to interested parties. 10 C.F.R. 51.95. If the NRC finds the plan satisfactory (i.e., in ____ accordance with regulations and not inimical to the common defense or the health and safety of the public), the Commission -4- issues a decommissioning order approving the plan and authorizing decommissioning. 10 C.F.R. 50.82(e). The Commission has stated that its regulations allow a licensee to conduct certain, limited decommissioning activities prior to obtaining NRC approval: [I]t should be noted that [10 C.F.R.] 50.59 permits a holder of an operating _______________________ license to carry out certain activities _______ without prior Commission approval unless these activities involve a change in the technical specifications or an unreviewed safety question. However, when there is a change in the technical specifications or an unreviewed safety question, 50.59 requires the holder of an operating license to submit an application for amendment to the license pursuant to 50.90 . . . . [T]his rulemaking do[es] not alter a licensee's capability to conduct activities under 50.59. Although the Commission must approve the _________________________________________ decommissioning alternative and major _________________________________________ structural changes to radioactive _________________________________________ components of the facility or other major _________________________________________ changes, the licensee may proceed with _______ some activities such as decontamination, minor component disassembly, and shipment and storage of spent fuel if these __________ activities are permitted by the operating _________________________________________ license and/or 50.59. _______ 53 Fed. Reg. at 24025-24026 (emphasis added). The Commission adhered to this position from the issuance of this statement in 1988 until 1993. See, e.g., Long Island Lighting Co., 33 N.R.C. ___ ____ ________________________ at 73 n.5 ("Major dismantling and other activities that constitute decommissioning under the NRC's regulations must await NRC approval of a decommissioning plan"); Sacramento Mun. Util. ______________________ Dist. (Rancho Seco Nuclear Generating Station), 35 N.R.C. 47, 62 _______________________________________________ n.7 (1992) (same). -5- B. Factual Background B. Factual Background __________________ On February 27, 1992, licensee Yankee Atomic Electric Company ("YAEC") announced its intention to cease operations permanently at Yankee NPS, a nuclear power plant located near Rowe, Massachusetts. One month later, YAEC applied for a license amendment to limit its license to a POL, a possession-only license, thus revoking YAEC's authority to operate the plant. The NRC published a Notice of Proposed Action informing the public of its opportunity to be heard on the license amendment request, pursuant to 189a of the AEA. 57 Fed. Reg. 13126, 13140 (April 15, 1992). There were no hearing requests; accordingly, the NRC issued the requested amendment to YAEC's license on August 5, 1992. 57 Fed. Reg. 37558, 37579 (Aug. 19, 1992). In the cover letter accompanying YAEC's amended license, the Commission reminded YAEC that "[t]he NRC must approve . . . major structural changes to radioactive components of the facility . . . ." See Issuance of Amendment No. __ to Facility ___ Operating License No. DPR-3 (N.R.C. Docket No. 50-029). At a meeting between YAEC and NRC representatives on October 27, 1992, YAEC proposed that the NRC grant permission for YAEC to initiate an "early component removal project" (the "CRP"), prior to submission and approval of its decommissioning _____ plan, and hence prior to conducting an environmental assessment of decommissioning at the site. YAEC explained that it wished expeditious commencement of this early CRP because of the unexpected availability of space in the Barnwell, South Carolina -6- Low-level Waste Disposal facility. If made to wait for submission and approval of a decommissioning plan, YAEC would lose its chance to use the Barnwell facility. Pursuant to this proposed CRP, YAEC would first remove the four steam generators and the pressurizer from the nuclear reactor containment, remove core internals from the reactor pressure vessel, and transport all of these radioactive components to the Barnwell facility. After this dismantling, YAEC proposed to then cut up the nuclear reactor core baffle plate (which is too radioactive to meet low-level waste criteria and thus cannot be dumped in the Barnwell site), and store the pieces in canisters in the spent fuel pool for future delivery to a U.S. Department of Energy waste site. Finally, YAEC planned to remove and transport the four main coolant pumps to the Barnwell site. These CRP activities would result in the permanent disposal of 90% of the nonfuel, residual radioactivity at Yankee NPS, all prior to approval of the actual decommissioning plan. _____ On November 25, 1992, YAEC sent a letter to the NRC which set forth YAEC's arguments as to how NRC regulations, Statements of Consideration issued with those regulations, and Commission precedents could be "interpreted" to allow approval of the early CRP, despite the fact that the Commission's interpretative policy at that time explicitly required NRC approval for major structural changes. During this period, CAN also wrote two letters to the NRC, on November 2, 1992 and again on December 21, 1992, -7- requesting inter alia that the Commission halt or postpone any _____ ____ and all dismantling activities at Yankee NPS until a decommissioning plan was submitted, moved through the public notice-and-comment process, and approved. In a December 29, 1992 letter to CAN, Kenneth Rogers, the Acting Chairman of the Commission, responded that the Commission was "considering a public meeting in the vicinity of the plant early in 1993 to provide information to the public on NRC's review of decommissioning in general and on expected site activities which will occur prior to the licensee's submittal of a decommissioning plan in late 1993." On January 14, 1993, following internal review of its decommissioning policies, the Commission issued a Staff Requirements Memo ("SRM"), setting forth a significant, substantial change from previously held agency positions on decommissioning activities, and essentially adopting YAEC's proposed "interpretation" of prior agency precedents and positions. Without any explanation for the substantial modification, or any further analysis, the SRM stated: Notwithstanding the Commission's _______________ statements in footnote 3 of CLI-90-08 [Long Island Lighting Co., 33 N.R.C. 61 _________________________ (1991)] and the Statements of Consideration for the decommissioning rules at 53 Federal Register 24025-26, licensees should be allowed to undertake any decommissioning activity (as the term "decommission" is defined in 10 C.F.R. 50.2) that does not -- (a) foreclose the release of the site for possible unrestricted use, (b) significantly increase decommissioning costs, (c) cause any significant environmental impact not -8- previously reviewed, or (d) violate the terms of the licensee's existing license (e.g., OL, POL, OL with confirmatory shutdown order etc.) or 10 C.F.R. 50.59 as applied to the existing license. . . . The staff may permit licensees to use their decommissioning funds for the decommissioning activities permitted above . . ., notwithstanding the fact _________________________ that their decommissioning plans have not _________________________________________ yet been approved by the NRC. ____________________________ Shortly after the Commission issued this SRM, YAEC advised the NRC that it planned to begin its CRP activities in accordance with this new policy.2 On June 30, 1993, the Commission issued another SRM reiterating its new decommissioning policy, and stating that it had voted to formally amend 10 C.F.R. 50.59 to reflect this new position. This proposed rulemaking is still underway. The Commission also stated that approval of a decommissioning plan is not an action that triggers hearing rights under 189a of the AEA, but that the Commission staff could, in its discretion, formulate an informal hearing process for decommissioning plan approval. On September 8, 1993, CAN again wrote to the NRC, again requesting a hearing on the CRP at Yankee NPS. CAN also generally alleged that the NRC was in violation of its own regulations, and in violation of "the rule making process," by allowing a licensee to engage in a CRP without prior Commission  ____________________ 2 Later, YAEC submitted a decommissioning plan, which is currently under NRC review. YAEC completed most of the CRP activities, however, before it ever submitted its decommissioning plan to the Commission, and well before any environmental assessment was performed. -9- approval. The Commission responded to these allegations in a letter dated November 18, 1993, stating that CAN had "failed to identify the proposed action that might be taken by the NRC Staff that requires the offer of a hearing." The next day, CAN filed a petition for agency review under 10 C.F.R. 2.206,3 requesting that the NRC halt the CRP activities pending an investigation by the Inspector General's office. In the petition, CAN reiterated its position that the CRP constitutes decommissioning, and that the NRC was thus in violation of its own regulations in allowing CRP activities at Yankee NPS prior to approval of a decommissioning plan. The NRC responded by letter dated December 29, 1993, explaining its policy change as set forth in the SRMs, and concluding that CAN's petition "does not provide any new information regarding why public health and safety warrants suspension of the CRP and therefore does not meet the threshold for treatment under 10 CFR 2.206." After a flurry of letters, in which CAN repeatedly requested formal hearings on the CRP and the Commission consistently denied these requests on the grounds that the CRP was inaccord withthe newpolicy, CANfiled thispetition forreview.4  ____________________ 3 Under 10 C.F.R. 2.206, members of the public may request agency enforcement action against a licensee that is allegedly in violation of an NRC regulation or requirement. 4 In April 1993, CAN also filed a motion in the United States District Court for the District of Massachusetts seeking a temporary restraining order to halt the CRP activities. The district court dismissed the action for lack of subject matter jurisdiction. Citizens Awareness Network v. NRC, 854 F. Supp. ___________________________ ___ -10- STANDARD OF REVIEW STANDARD OF REVIEW We review agency actions and decisions with substantial deference, setting them aside only if found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. 706(2)(A); Motor Vehicle _____________  ____________________ 16, 18-19 (1994). In so doing, however, the district court wrote: The court makes this decision with a heavy heart. The plaintiffs have been diligently attempting for months to get a hearing on the appropriateness and competence of the NRC's actions. Many of them live near the site of the decommissioned nuclear plant. They and their families are the most directly at risk if the job of removing contaminated materials is bungled. . . . Not only have the plaintiffs been denied the opportunity to present their concerns and to hear the response of the NRC at a formal hearing, they have not as yet even been afforded a forum in which to argue their entitlement to a hearing. They had ___________ no incentive to seek a hearing when the NRC originally issued the POL, because at that time it was the policy of the NRC to ___ require final approval and NEPA compliance before authorizing early component removal. Months later, the NRC now concedes, this policy changed and the NRC decided to view the POL as itself authorizing early component removal without more. Requests for hearing at this point were denied. . . . This course of conduct suggests a concerted bureaucratic effort to thwart the efforts of local citizens to be heard about an event that vitally affects them and their children. . . . The prospect that this tactic may be used nationally, as more nuclear plants shut down, . . . is, to put it mildly, disquieting. Id. at 19 (emphasis in original). __ -11- Mfrs. Ass'n v. State Farm Mut. Ins. Co., 463 U.S. 29, 41 (1983). ___________ ________________________ The scope of this review is narrow; a court should not substitute its judgment for that of the agency, and agency decisions will be upheld so long as they "'do not collide directly with substantive statutory commands and so long as procedural corners are squarely turned.'" Adams v. EPA, 38 F.3d 43, 49 (1st Cir. 1994) (quoting _____ ___ Puerto Rico Sun Oil Co. v. EPA, 8 F.3d 73, 77 (1st Cir. 1993)). ________________________ ___ This deference is especially marked in technical or scientific matters within the agency's area of expertise. Id. __ While this is a highly deferential standard of review, it is not a rubber stamp; in order to avoid being deemed arbitrary and capricious, an agency decision must be rational. Id.; Puerto Rico Sun Oil Co., 8 F.3d at 77. Moreover, when an __ ________________________ administrative agency departs significantly from its own precedent, "it must confront the issue squarely and explain why the departure is reasonable." D vila-Bardales v. INS, 27 F.3d 1, _______________ ___ 5 (1st Cir. 1994). This is not to say that agencies must forever adhere to their precedents; agencies may "refine, reformulate and even reverse their precedents in the light of new insights and changed circumstances." Id. See also Rust v. Sullivan, 500 U.S. __ ________ ____ ________ 173, 186-87 (1991). An agency changing its course must, however, supply a reasoned analysis for the change. Motor Vehicle Mfrs. ___________________ Ass'n, 463 U.S. at 42; Puerto Rico Sun Oil Co., 8 F.3d at 77. _____ ________________________ With these principles in mind, we turn to the merits of CAN's petition. ANALYSIS ANALYSIS -12- CAN raises three principal arguments. First, CAN contends that the NRC's refusal to grant CAN a formal hearing before allowing YAEC to conduct decommissioning constitutes a regulatory taking of their property without due process or compensation, denies CAN members their right to due process under the Fifth Amendment, and violates the hearing requirements of 189a of the AEA. Second, CAN argues that the Commission has violated NEPA by allowing YAEC to accomplish almost 90% of its decommissioning activities before conducting any environmental assessment. Finally, CAN contends that the NRC's unexplained change in its decommissioning policy was irrational and contrary to its own duly-promulgated regulations, in violation of the procedural requirements of the APA. We address these contentions in reverse order. A. The NRC's Change In Policy A. The NRC's Change In Policy __________________________ CAN argues that the Commission's significant policy shift, manifested in its two Staff Requirements Memos, improperly revoked duly-promulgated Commission regulations, interpretations and precedents, without the benefit of rulemaking procedures or even a rational explanation for the change. By allowing YAEC to commence the CRP activities notwithstanding its own precedents and regulations, CAN contends, the Commission acted arbitrarily and capriciously, in violation of the APA. In defense of the unexplained change in its decommissioning policy, the NRC maintains that the former policy had never been incorporated into -13- the regulations themselves, and, in any case, that agencies are free to alter their interpretations of their own regulations.5 While this is certainly true, any such alteration or reversal must be accompanied by some reasoning -- some indication that the shift is rational, and therefore not arbitrary and capricious. Puerto Rico Sun Oil Co., 8 F.3d at 77-78. See also _______________________ ________ Atchison, Topeka & Santa Fe Ry. Co. v. Wichita Bd. of Trade, 412 ___________________________________ _____________________ U.S. 800, 808 (1973)("Whatever the ground for the [agency's] departure from prior norms, . . . it must be clearly set forth so that the reviewing court may understand the basis of the agency's action."). Courts should not attempt to supply a reasoned basis for the action that the agency itself has not given. Motor _____ Vehicle Mfrs. Ass'n, 463 U.S. at 43. While this is not a ____________________ difficult standard to meet, the Commission has not met it here. The prior Commission policy regarding decommissioning, embodied in 10 C.F.R. 50.59 and explicated in the Commission's published Statement of Consideration, required NRC approval of a decommissioning plan before a licensee undertook any major structural changes to a facility. This policy was developed through a lengthy notice and comment period, with substantial public participation. See 53 Fed. Reg. 24018, 24020 (a total of ___  ____________________ 5 We are baffled by the Commission's assertion that "CAN has not challenged this modification of NRC policy," as we count three pages of argument in CAN's brief devoted to this precise issue. Nor can the Commission claim that CAN did not raise this issue prior to filing this petition for review. In both its September 8, 1993 letter to the NRC and its 2.206 enforcement petition, CAN alleged that the Commission was in violation of its own regulations and of the "rule making process."  -14- 143 individuals and organizations submitted comments on proposed rule). The Commission adhered to this policy for almost five years, reiterating its position in at least two adjudicatory decisions. Then, rather suddenly, the Commission circulated two internal staff memos that completely reversed this settled policy, without any notice to the affected public. More troubling, however, was the Commission's failure to provide in those memos, or anywhere else, any justification or reasoning whatsoever for the change. The memos did not set forth any new facts, fresh information, or changed circumstances which would counsel the shift. Nor did they provide any legal analysis of how the new policy comported with, or at least did not conflict with, existing agency regulations. With nothing more than a breezy "notwithstanding," the Commission abruptly disposed of five years' worth of well-reasoned, duly-promulgated agency precedent. Moreover, the NRC's actions are inconsistent with the plain terms of the AEA, the NRC's enabling statute, which provide that "in any proceeding for the issuance or modification of rules ____________ and regulations dealing with the activities of licensees, . . . the Commission shall grant a hearing upon the request of any person whose interest may be affected by the proceeding. . . ." 42 U.S.C. 2239(a)(1)(A) (emphasis added). While the NRC's policy shift involved an interpretation of its regulation, and not the regulation itself, it was an interpretative policy that provided a great deal of substantive guidance on the rather -15- ambiguous language of the regulation, by specifically delineating the permissible activities of licensees. We think that the statute's phrase "modification of rules and regulations" encompasses substantive interpretative policy changes like the one involved here, and therefore that the Commission cannot effect such modifications without complying with the statute's notice and hearing provisions. See Natural Resources, Etc. v. ___ ________________________ NRC, 695 F.2d 623, 625 (D.C. Cir. 1982)("Fair notice to affected ___ parties requires that the Commission not alter suddenly and sub ___ silentio settled interpretations of its own regulations.").6 ________ Finally, we agree with the petitioners that the Commission's new policy appears utterly irrational on its face. __________ By allowing licensees to conduct most, if not all, of the permanent removal and shipment of the major structures and radioactive components before the submittal of a decommissioning plan, it appears that the Commission is rendering the entire decommissioning plan approval process nugatory. Why should a licensee be required to submit such a plan if its decommissioning is already irreversibly underway? Why offer the public the opportunity to be heard on a proposed decommissioning plan if the actual decommissioning activities are already completed? In  ____________________ 6 The Commission points out that in June 1993 it held a public meeting, attended by several CAN members. Although the meeting was ostensibly to address the community's questions about the decommissioning activities at Yankee NPS, the transcript of the meeting indicates that the NRC representatives carefully sidestepped the few questions raised about the recent change in Commission policy regarding decommissioning. We do not think that this type of forum or proceeding meets the hearing requirements of the AEA. -16- short, the Commission's new decommissioning policy seems to render any regulatory oversight of the decommissioning process moot. Perhaps a rational basis for this policy exists, but we cannot see one, and the Commission has not provided one. The Commission's failure to provide any explanation for its seemingly irrational change in policy renders its new policy arbitrary and capricious, and not in accordance with the requirements of 42 U.S.C. 2239(a)(1)(A). We therefore remand the issue of the NRC's change in decommissioning policy for further proceedings, in accordance with the AEA's hearing requirements and this opinion. B. Petitioner's NEPA Arguments B. Petitioner's NEPA Arguments ___________________________ CAN also contends that the Commission's irrational interpretation of its regulations has led to the agency's permitting YAEC to accomplish over 90% of the decommissioning activities at Yankee NPS prior to conducting any EA or EIS, in violation of NEPA, 42 U.S.C. 4332.7 In response, the  ____________________ 7 The National Environmental Policy Act, 42 U.S.C. 4321 et __ seq., requires all federal agencies, including the NRC, to ___ prepare a "detailed statement," containing specified environmental information, for all proposed "major federal actions significantly affecting the quality of the human environment." 42 U.S.C. 4332 (2)(C). When the NRC plans to issue a license amendment or take some other form of regulatory action that requires NEPA compliance, the NRC will publish either an EA stating that there is no significant impact on the environment from the proposed action, or an EIS, reviewing the impact of the proposed action and listing alternatives. 10 C.F.R. 51.20, 51.21. When approving a licensee's request to decommission, the NRC prepares either a supplemental EIS for the post-operating license stage, or an EA updating the prior environmental review for the facility, as it deems appropriate. 10 C.F.R. 51.95(b). -17- Commission claims that the CRP activities do not constitute a "major federal action" triggering NEPA compliance. The Commission explains that it did not actively permit YAEC to initiate CRP activities; rather, it "simply reviewed YAEC's implementation of the CRP, as a part of its everyday oversight of its licensee's activities, and found no reasons to interfere with YAEC's plans." Because mere "regulatory oversight, as opposed to active permission, does not implicate NEPA," the NRC argues, no EA or EIS was required. This argument is completely devoid of merit. First, the Commission holds in trust certain funds set aside by licensees, including YAEC, to finance decommissioning activities. 42 U.S.C. 2232(a). The Commission therefore had to approve the release of these set-aside funds in order to finance YAEC's CRP activities. See Letter from Morton B. Fairtile re: ___ Decommissioning Funds, N.R.C. Docket No. 50-029 (April 16, 1993). In essence, the Commission had to actively permit the release of _______________ funds, or YAEC could not have initiated the CRP. Far from being "mere oversight," we think the Commission's approval of financing certainly constitutes its active permission of the CRP. Second, it is undisputed that decommissioning is an action which, even under the Commission's new policy, requires NEPA compliance. 10 C.F.R. 51.95(b). In "advising" YAEC that it could initiate decommissioning prior to submitting a decommissioning plan, the NRC effectively granted YAEC permission to commence activities normally conducted after decommissioning plan approval, including _____ -18- the removal and storage of almost all of the radioactive components. This permission, in turn, allowed YAEC to decommission its facility without the benefit of NEPA compliance by the Commission.  Regardless of the label the Commission places on its decision to release the necessary funds to YAEC and "advise" the licensee to go ahead with its CRP, it was effectively, even explicitly, permitting YAEC to decommission the facility. An agency cannot skirt NEPA or other statutory commands by essentially exempting a licensee from regulatory compliance, and then simply labelling its decision "mere oversight" rather than a major federal action. To do so is manifestly arbitrary and capricious.  We note that the Commission's arguments on this issue are implicitly predicated on the assumed validity of its new interpretative policy. As we have explained, however, the Commission has failed to provide any rational explanation for this policy, thus rendering it arbitrary and capricious. The Commission therefore cannot rely on its new policy as a basis for its decision that NEPA compliance was unnecessary prior to decommissioning at Yankee NPS. Accordingly, we find that the Commission's action in allowing YAEC to complete 90% of the decommissioning at Yankee NPS prior to NEPA compliance lacked any rational basis, and was thus arbitrary and capricious. We remand -19- this issue to the Commission for actions in accordance with this holding.8 C. Petitioner's Remaining Arguments C. Petitioner's Remaining Arguments ________________________________ 1. Petitioner's Fifth Amendment Arguments 1. Petitioner's Fifth Amendment Arguments ______________________________________ CAN contends that because the property interests of its members have been "invaded by radiation due to the NRC's regulatory decisions concerning the decommissioning" of Yankee NPS, the NRC's actions constitute a regulatory taking of their property in violation of the Fifth Amendment. We need not dwell on this argument, however, as CAN has not stated a cognizable takings claim. Beyond its general statement that its property interests have been "invaded" by radiation, CAN has not explained or argued even generally how this is so, nor does it offer any factual support for its claims regarding radiation.9 CAN also does not seek compensation for any alleged invasion of its property interests, but simply wishes a hearing on the CRP activities. Given the sparsity of its allegations and the  ____________________ 8 We recognize that this holding comes too late to prevent much of the CRP activity. There remains, however, a significant amount of radioactive material and structures at the Yankee NPS site, the removal of which will continue to affect CAN members. This continued removal will undoubtedly continue to pose health, safety and environmental questions, thereby requiring NRC oversight and NEPA compliance. CAN's arguments on this point are therefore not moot.  9 In its brief, CAN does point to the statement made in an affidavit by CAN member Will Sparks, describing the NRC's actions as "a form of invasion, like have [sic] a stranger in the house, like being burglarized." Even assuming that Mr. Sparks' affidavit is properly part of the record in this petition, this statement is simply insufficient to support a broad takings claim like the one put forth here.  -20- complete lack of argument or factual support for its bare assertion, we see no reason to depart from the well-settled rule in this circuit that "issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." United States v. Zannino, 895 F.2d 1, 17 (1st _____________ _______ Cir. 1990). "It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones." Id. Consequently, we reject __ CAN's takings claim. Nor do we find any merit in CAN's rather vague allusion to a more general Fifth Amendment argument, presumably that the NRC's actions deprived its members of life, liberty or property without due process of law. This contention suffers from the same deficiencies as CAN's takings claim, being overbroad, vague, and unaccompanied by factual support or analysis. Moreover, as the NRC points out, "generalized health, safety and environmental concerns do not constitute liberty or property subject to due process protections." West Chicago, Ill. v. NRC, 701 F.2d 632, __________________ ___ 645 (7th Cir. 1983). We simply cannot fashion a constitutional violation out of whole cloth on the basis of the kind of nonspecific and unsupported allegations raised by CAN here. Accordingly, we reject CAN's allegations that the NRC's actions violated its members' Fifth Amendment due process rights. 2. Petitioner's Atomic Energy Act Arguments 2. Petitioner's Atomic Energy Act Arguments ________________________________________ CAN contends that Commission approval of YAEC's CRP violated AEA section 189a, which requires the Commission to grant -21- a hearing upon request by any party in interest whenever it undertakes any proceeding to "amend" a license. 42 U.S.C. 2239 (a)(1)(A). CAN argues that Commission approval of YAEC's CRP was a de facto "amendment" of YAEC's POL because it authorized YAEC __ _____ (as well as other extant and prospective licensees) to engage in materially different conduct not permitted under the pre-1993 POL, namely, major component dismantling absent prior NRC approval of a final decommissioning plan. See 53 Fed. Reg. 24018, ___ 24020 (1988). The Commission counters that its so-called "approval" of the CRP cannot be deemed a license "amendment" proceeding since the language requiring NRC approval for major structural changes was never expressly incorporated into YAEC's license.10 Instead, it says, the decommissioning plan procedure, which is subject to procedural protections (e.g., ____ public hearings, preparation of environmental assessments) entirely different from those designated in section 189a, was __________________ described only in a cover letter accompanying the license, and the Commission has never treated the decommissioning plan process as "amendatory" for section 189a purposes. We reject the Commission's claim that its abrupt policy change in 1993, to the extent it substantially enlarged the authority of an extant licensee (YAEC) retroactively, nonetheless ______  ____________________ 10 As a threshold matter, the Commission repeats its contention that no 2239(a)(1)(A) "proceeding" occurred, because it took no affirmative action and merely refused to intervene to prevent YAEC from undertaking the CRP. For the reasons previously noted in our discussion of the Commission's NEPA violations, see supra ___ _____ at 17-18, we disagree with this characterization. -22- did not entitle CAN to the requested section 189a hearing. As the Commission itself concedes, by its nature a license is presumptively an exclusive -- not an inclusive -- regulatory _________ device. See Brief for Respondent at 5 ("Th[e] license describes ___ the facility and the authorized activities that the operator may conduct under the license. If the holder of the licensee (sic) . . . wishes to modify the facility or to take actions that are not ______________________________________________________ specifically authorized under the license, the licensee may need __________________________________________ to seek a change or 'amendment' to the terms of the license.") (emphasis added). The sophistical suggestion that the decommissioning plan procedures were never formally incorporated into YAEC's POL license ignores licensing realities. Licenses customarily delineate the types of regulated conduct in which the licensee may engage. Regulated conduct which is neither delineated, nor reasonably encompassed within delineated categories of authorized conduct, presumptively remains unlicensed. YAEC's original license did not authorize it to implement major-component dismantling of the type undertaken in the CRP. Thus, if section 189a is to serve its intended purpose, surely it contemplates that parties in interest be afforded a meaningful opportunity to request a hearing before the Commission ______ retroactively reinvents the terms of an extant license by voiding _____________ its implicit limitations on the licensee's conduct. See Skidgel ___ _______ v. Maine Dep't of Human Servs., 994 F.2d 930, 937 (1st Cir. 1993) ___________________________ (statutory language must be interpreted in context, including its -23- legislative purpose). The claimed right to deny such a hearing request undermines the integrity of the licensing process. At the time YAEC obtained its original license, and again when it amended the original license to a POL, parties in interest, including CAN, presumably refrained from any request for a section 189a hearing -- to which they would unquestionably have ______________ been entitled -- in reasonable reliance upon such implicit limitations in YAEC's license. The Commission correctly points out that we have observed that the term "amend," as used in section 189a, is to be construed quite literally. See Commonwealth of Mass. v. United ___ ______________________ ______ States Nuclear Regulatory Comm'n, 878 F.2d 1516, 1522 (1st Cir. _________________________________ 1989). But we were careful to note as well that it is the substance of the NRC action that determines entitlement to a _________ section 189a hearing, not the particular label the NRC chooses to ___ assign to its action. Id. at 1521 (citing Columbia Broadcasting ___ _____________________ Syst. Inc. v. United States, 316 U.S. 407, 416 (1942)).11 __________ _____________  ____________________ 11 Moreover, Commonwealth is readily distinguishable on its ____________ facts. There, the NRC decision approving resumption of operations by a licensee, which had shut down its facility voluntarily prior to any formal suspension or revocation of its operating license by the NRC, did not implicate section 189a. Rather, the NRC requirements for license "reinstatement" were simply additional interim license restrictions -- imposed ___________________________________________ pursuant to pre-existing Commission regulations -- none of which ____________ conflicted with, or required the alteration of, any term of the original license. Commonwealth, 878 F.2d at 1520-21 (citing and ____________ adopting rationale in In re Three Mile Island Alert, Inc., 771 _____________________________________ F.2d 720 (3d Cir. 1985), cert. denied, 475 U.S. 1082 (1986)). _____ ______ Thus, the operator obtained no greater authority (literally, _______ "license") than it had before its license was reinstated by the NRC. Id. at 1520. Even though the Commission temporarily ___ exempted the licensee from one restriction generally applicable to other licensees, the discretionary exemption was expressly -24- By contrast, the policy change adopted by the Commission in 1993, relating to "minor" component dismantling, was in no sense provisional. Moreover, it undeniably supplemented the operating authority of extant licensees ____________ generally, and YAEC in particular, which might henceforth engage in major forms of component disassembly beyond the ambit of their original licenses. Prior to 1993, parties in interest reasonably could presume that YAEC was not authorized to undertake this type of CRP unless it submitted to the lapidary process of preparing a final decommissioning plan and environmental assessment acceptable to the NRC, or it moved to amend its existing license. _________________________________________ Then, in 1993, the Commission, by ambiguous fiat, declared that some forms of "major component disassembly" hence- forth were to be outside the license-amendment process, whereas ___________________ more "serious" types of component removal were to remain subject to the amendment process. See 10 C.F.R. 50.59. In our view, ___ however, the latter provision plainly confirms that the Commission had always considered component disassembly, similar to that involved in YAEC's CRP, as action beyond the ambit of the presumptive authority granted under the licenses it issued. The Commission elevates labels over substance. It would have us determine that a "proceeding" specifically aimed at excusing a licensee from filing a petition to amend its license  ____________________ authorized and granted under pre-existing agency regulations, see ____________ ___ id. at 1521, so that parties in interest were on notice from the ___ ________ time the license was granted that NRC retained the discretion to ____________________________ approve the limited exemption at any time in the future. -25- is not the functional equivalent of a proceeding to allow a de __ facto "amendment" to its license. As this construct would _____ eviscerate the very procedural protections Congress envisioned in its enactment of section 189a, we decline to permit the Commission to do by indirection what it is prohibited from doing directly. See 42 U.S.C. 2239(a)(1)(A) (Commission must afford ___ hearing "in any proceeding for the . . . modification of rules and regulations dealing with the activities of licensees."). We therefore hold that CAN was entitled to a hearing under section 189a in connection with the NRC decision to permit YAEC's early CRP. CONCLUSION CONCLUSION For the foregoing reasons, we grant CAN's petition for _____ review in part, and remand to the Commission for proceedings ______ consistent with this opinion. -26-