**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 16a0401n.06

Case No. 15-3677

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
Jul 15, 2016
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| VARINDER SINGH, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | ON PETITION FOR REVIEW |
| v. | ) | FROM THE UNITED STATES |
| | ) | BOARD OF IMMIGRATION |
| LORETTA E. LYNCH, U.S. Attorney | ) | APPEALS |
| General, | ) | |
| | ) | |
| Respondent. | ) | |
| | ) | |

BEFORE: BOGGS, CLAY, and GILMAN, Circuit Judges.

BOGGS, Circuit Judge. Varinder Singh, a native and citizen of India, entered the United States without inspection. After the Department of Homeland Security brought removal proceedings against him in 2010, Singh filed an application for asylum, withholding of removal, and relief under the Convention Against Torture. Singh stated that he feared persecution at the hands of Indian authorities, who allegedly abused him on account of his membership and role in Shiromani Akali Dal (Mann), a political group that advocates the creation of an independent nation in what is now the Indian state of Punjab. After hearing evidence, the immigration judge found Singh removable, held that he was ineligible for asylum, withholding of removal, and relief under the Convention Against Torture, and ordered that he be deported to India. The

Board of Immigration Appeals affirmed. Singh now petitions for review of the Board's decision. For the reasons given below, we deny Singh's petition.

I

A

The Shiromani Akali Dal (Badal) ("Akali Dal Badal") is a Sikh-centered political party that controls the government of Punjab, one of India's twenty-nine states. Sukhbir Singh Badal, the party's president, also serves as Punjab's deputy chief minister. The Akali Dal Badal is strenuously opposed by Simranjit Singh Mann, a Punjabi Sikh who leads a rival political faction called the Shiromani Akali Dal (Mann) ("Akali Dal Mann"). Whereas Badal's party has allied itself with India's national governing coalition, Mann and his supporters oppose the Indian government and advocate the creation of Khalistan, an independent homeland for Sikhs that they envision will be carved out of present-day Punjab. Petitioner Varinder Singh alleges that Indian authorities have taken a dim view of Mann's secessionist movement and have cracked down on his group's activities. According to Singh, the Akali Dal Badal has also rejected Mann's rival faction and has worked with Punjabi police to harass Mann's supporters.

Singh is a twenty-seven-year-old native of Punjab and an adherent of the Sikh faith. When he was a child, Akali Dal Mann recruiters often visited his school in an effort to convince schoolchildren to join Mann's cause. While in school, Singh attended Akali Dal Mann rallies, and he alleges that he ultimately joined the organization on March 3, 2009, a few years after graduating from high school. Upon becoming a member, Singh apparently began to organize rallies for the Akali Dal Mann and returned to his former school to recruit new members.

Singh maintains that in September 2009, police detained him for seven days after he organized a rally in Punjab and gave a public speech. Police allegedly bound, interrogated, and

beat him each day until his uncle bribed officers to release him. According to Singh, officers subsequently arrested him again while he was delivering another speech in January 2010, took him to the same police station, and beat him severely until his uncle again paid for his release. Singh alleges that after this second incident, officers threatened to kill him if he ever participated in another Akali Dal Mann rally.

These two incidents apparently convinced Singh to leave India. Singh maintains that his uncle hired an agent to smuggle him from India to the United States, and that on March 14, 2010, Singh and the agent flew to Toronto, Ontario. The following day, the agent purportedly placed Singh into the trunk of a car, covered him with clothes, and transported him across the United States border and eventually to Dayton, Ohio. A family friend picked Singh up at a Dayton bus station, and Singh has remained in the Dayton area since.

On June 22, 2010, Dayton police detained Singh and contacted the Department of Homeland Security ("DHS") "to determine [his] citizenship and alienage." Two weeks later, DHS charged Singh with removability under 8 U.S.C. § 1182(a)(6)(A)(i). At a hearing in September 2010, Singh conceded his removability and filed an application for asylum, withholding of removal, and relief under the Convention Against Torture ("CAT"). Singh claimed that he had been "arrested, jailed, and tortured" by Indian police on account of his advocacy on behalf of Akali Dal Mann and stated that Indian police would torture him again if he were returned to India.

B

Nearly two years later, on June 25, 2012, an immigration judge ("IJ") conducted a merits hearing at which she received into evidence Singh's application, three State Department reports on human-rights conditions in India, a declaration by a human-rights lawyer named Karen

Parker, and a letter from Akali Dal Mann dated March 3, 2009. Parker, an expert witness who planned to testify telephonically, wrote that "Singh's statements are consistent with practices in India, especially in the Punjab area," where she had "found a pattern of arresting Sikhs, torturing them, and then releasing them after heavy bribes are paid." Parker opined that "it is doubtful that the police would simply leave [Singh] alone should he reappear in India."

Singh supported Parker's declaration with the letter from Akali Dal Mann, which stated that Singh is a "permanent member" of the organization who, if "return[ed] to India[,] . . . will be persecuted by the state." The letter's author opined that "Varinder Singh [may] also be falsely involved in a criminal case, detained illegally[,] and even eliminated in a fake police encounter," and referred to various human-rights abuses allegedly committed by Indian authorities. The letter concluded with a recommendation that "Varinder Singh be given political asylum."

In addition to considering this documentary evidence, the IJ heard Singh's testimony. Singh recounted that he joined the Akali Dal Mann party on March 3, 2009, and was the victim of police brutality on the two occasions mentioned above. He also claimed to have traveled to the United States through Canada in March 2010. Singh maintained that he feared that Indian police officers would target him for his political activities if he returned to Punjab. Singh also opined that he would not be safe elsewhere in India because he would have to give fingerprints to obtain public benefits, thereby enabling police in any state to discover his prior record. When asked why he had not produced any documentation from his uncle, other members of Akali Dal Mann with whom he was arrested, or the medical assistant who treated his wounds after he was beaten by police, Singh explained that he had not asked those individuals to mail him evidence out of fear that Indian authorities would intercept their mail and retaliate against them.

On cross-examination, counsel for DHS asked Singh why the March 3, 2009, letter from Akali Dal Mann listed Singh's address in Ohio, given that Singh testified both that he had lived in India until March 14, 2010, and that he had brought the letter with him when he traveled to the United States. Singh replied that although Akali Dal Mann had initially issued the letter on March 3, 2009, Singh subsequently asked the group's members to update the letter with his new address after he arrived in the United States. He testified that a friend then mailed a new copy of the letter to Ohio using a false name, presumably on the return address. The IJ then asked Singh why Akali Dal Mann would give Singh a letter requesting that Singh be granted asylum on the very day that he joined the party. Singh replied that Akali Dal Mann assumed responsibility for his security as soon as he became a member.

After Singh finished testifying, the IJ attempted to contact Parker by phone, but neither the IJ nor Singh's counsel was able to reach the expert after several attempts. After hearing closing arguments and informing the parties that she would schedule a subsequent hearing "for oral decision," the IJ adjourned the hearing.

More than two months later, Singh filed a motion to permit Parker to testify at the subsequent hearing. The IJ denied the motion, explaining that the "[r]ecord was closed at [the] end of [the] individual hearing" on June 25, 2012, and that the "[f]inal hearing is for [an] oral dec[ision] only." Singh also filed an "evidence packet" that included five affidavits from Singh's relatives and acquaintances in India. The affiants, among them Singh's uncle, stated that Singh had been arrested, beaten, and tortured by Punjabi police because of his membership in Akali Dal Mann, that Singh's uncle arranged to send Singh away from India on March 14, 2010, and that Singh reached the United States the following day. The packet also included an

5

affidavit from Singh's family friend, who asserted that he picked Singh up at the Dayton Greyhound bus station on March 15, 2010.

At a December 2012 hearing conducted for the purpose of rendering an oral decision, the IJ again refused to allow Parker to testify, ruling that the record was closed. The IJ also refused to admit Singh's new affidavits into the record because they were not timely filed, Singh had not made a request to reopen the record, and the affidavits were not previously unavailable. The IJ proceeded to render an oral decision in which she found Singh removable, denied his application for asylum, withholding of removal, and relief under the CAT, and ordered him to be deported to India.

The IJ explained that she did not find Singh to be a credible witness "due to a number of inconsistencies" in his testimony and its "lack of plausibility." In particular, the IJ stated that the Akali Dal Mann letter recommending that Singh was eligible for asylum was suspect. The IJ found it "highly suspicious that a document would be issued the day someone joins a party suggesting that [that] individual needs asylum." The IJ also noted that Singh had given inconsistent testimony about how he obtained the letter, first testifying that he brought it to the United States himself and later testifying that a friend sent it to him by mail. "In addition to being inconsistent," the IJ continued, Singh's explanation that a friend mailed him the letter "makes no sense because [Singh] repeatedly testified that he did not get other forms of corroboration due to concerns about having people mail him documents" without reprisal. The IJ also found it troubling that Singh had provided no corroboration of his testimony concerning the police abuse or the timing of his arrival in the United States. The IJ explained that Parker's declaration was not sufficient because Parker's "conclusions are based on an assumption that [Singh's] claim" of police abuse is credible, which the IJ found "did not occur in this case."

6

Based on her findings that Singh did not testify credibly and failed to submit evidence corroborating the date of his entry into the United States, the IJ held that Singh failed to prove that he submitted an asylum application within one year of arriving in the country. The IJ also held that without reliable corroboration of his claims of police abuse, Singh had not shown entitlement to withholding of removal or relief under the CAT. The IJ explained that "the objective evidence in the record does not establish that either members of [Singh's] political party or Sikhs generally are being persecuted in India today." The IJ then found Singh removable, denied his application in full, and ordered that he be removed to India.

The Board of Immigration Appeals ("BIA") affirmed, and further held that the IJ's refusal to allow Parker to testify at the second hearing and her decision not to consider the late-filed affidavits were within her discretion, explaining that Singh had not shown that he lacked a fair opportunity to present the evidence. This petition followed.

C

In his briefing before this court, Singh challenges the BIA's determination that his asylum application was not timely, claims that the IJ's refusal to admit additional evidence was an abuse of discretion that denied him due process of law, and contests the BIA's determinations that he did not testify credibly and is ineligible for withholding of removal and relief under the CAT. We address each argument in turn.

II

To be eligible for asylum, an alien must ordinarily show by "clear and convincing evidence" that he filed an application for asylum within "[one] year after the date of [his] arrival in the United States." 8 U.S.C. § 1158(a)(2)(B). Because Singh filed his application on September 14, 2010, he is eligible for asylum only if he shows by clear and convincing evidence

that he entered the country no earlier than September 14, 2009. *See Minasyan v. Mukasey*, 553 F.3d 1224, 1228–29 (9th Cir. 2009); *Soe v. Gonzales*, 227 F. App'x 468, 469 (6th Cir. 2007) (per curiam). Pointing to his application and testimony, in which he stated that he arrived in the United States on March 15, 2010, as well as the corroborating affidavits in the late-filed "evidence packet," Singh argues that the BIA abused its discretion in concluding that he failed to show that his application for asylum was timely filed.

We lack jurisdiction to consider Singh's claim. Section 208(a)(3) of the Immigration and Naturalization Act ("INA") provides that "[n]o court shall have jurisdiction to review any determination of the Attorney General" that an alien has failed to "demonstrat[e] by clear and convincing evidence that [his] application has been filed within [one] year after the date of [his] arrival in the United States." 8 U.S.C. § 1158(a)(2)(B), (a)(3). Section 106 of the REAL ID Act, which amended the INA, states that "[n]othing . . . in any . . . provision of this chapter (other than this section) which limits or eliminates judicial revie[w] shall be construed as precluding review of constitutional claims or questions of law raised upon a petition for review filed with an appropriate court of appeals." *Id.* § 1252(a)(2)(D). Construed together, these two provisions vest this court with jurisdiction to review a BIA determination concerning the timeliness of an asylum application "when the appeal seeks review of constitutional claims or matters of statutory construction," but "not when the question is discretionary or factual." *Khozhaynova v. Holder*, 641 F.3d 187, 191 (6th Cir. 2011) (quoting *Shkulaku-Purballori v. Mukasey*, 514 F.3d 499, 502 (6th Cir. 2007)).

"[T]he timeliness of an alien's asylum application is usually a question of fact," *Lopez v. Holder*, 511 F. App'x 500, 504 (6th Cir. 2013) (alteration in original) (quoting *Shkulaku-Purballori*, 514 F.3d at 502), and such is the case here, where Singh's argument is that "[t]he

totality of the circumstances and evidence of record compels a finding that [Singh] . . . arrived in the United States . . . on March 15, 2010." Pet'r Br. 18. Accordingly, we lack jurisdiction to consider Singh's claim that he timely filed an asylum application. *See Diallo v. Holder*, 364 F. App'x 992, 995–96 (6th Cir. 2010); *see also Rais v. Holder*, 768 F.3d 453, 462 n.17 (6th Cir. 2014) (rejecting contrary approach of *Ramadan v. Gonzales*, 479 F.3d 646 (9th Cir. 2007) (per curiam)).

To the extent that the references to a "right to due process" in Singh's reply brief represent an attempt to evade this jurisdictional bar, an asylum-related argument premised on the Fifth Amendment is not properly before this court. *See In re Anheuser-Busch Beer Labeling Mktg. & Sales Practices Litig.*, No. 14-3653, 2016 WL 1104916, at \*14 (6th Cir. Mar. 22, 2016) ("[W]e have considered arguments raised for the first time in reply briefs to be forfeited . . . ."); *McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones." (alterations in original) (quoting *Citizens Awareness Network, Inc. v. U.S. Nuclear Regulatory Comm'n*, 59 F.3d 284, 293–94 (1st Cir. 1995))). For these reasons, the BIA's denial of Singh's asylum application is not grounds for granting Singh's petition.

III

Singh next claims that the IJ denied him due process by refusing to allow Parker a second opportunity to testify and by declining to consider the packet of six affidavits that he submitted after the June 2012 hearing. Singh argues that Parker's testimony and the six affidavits would

have been highly probative and that "there was no just cause . . . to deny [Singh] the opportunity to present" this evidence. Pet'r Br. 19.

Asylum seekers have a Fifth Amendment right to due process in removal proceedings, and this right is violated if the "proceeding was so fundamentally unfair that the alien was prevented from reasonably presenting his case." *Hassan v. Gonzales*, 403 F.3d 429, 436 (6th Cir. 2005) (quoting *Ladha v. INS*, 215 F.3d 889, 904 (9th Cir. 2000)). We review alleged violations of due process de novo. *Id.* at 435. For the reasons that follow, our independent review of the record leads us to conclude that no such violation occurred with respect to the IJ's refusal to allow Parker a second opportunity to testify or her refusal to consider the late-filed packet of affidavits.

Due process required the IJ to give Singh a reasonable opportunity to present Parker's testimony. *See Zolotukhin v. Gonzales*, 417 F.3d 1073, 1075 (9th Cir. 2005). We are satisfied that the IJ complied with this requirement. Unlike cases in which an IJ denied a petitioner due process by refusing to consider an available witness's testimony, *see, e.g.*, *id.* at 1076, the IJ was willing to hear and consider Parker's opinion. Moreover, in addition to allowing counsel to try to contact Parker, the record makes clear that the IJ herself made several attempts to reach Parker by phone at the June 2012 hearing. When Parker did not answer, the IJ concluded that "[a]t this point I'm not sure what else we can do" to hear Parker's testimony because the IJ had "given her about a half an hour to make contact." Singh did not move for a continuance, and the IJ proceeded to hear closing arguments.

Having given Singh a fair opportunity to present Parker's testimony, the IJ was under no obligation to ensure that Parker appeared to testify. On the contrary, Singh bore the responsibility of ensuring that his witness appeared as planned. *Cf. United States v. Sawyers*,

902 F.2d 1217, 1219 (6th Cir. 1990) (holding that to justify a continuance for purposes of locating a witness, a criminal defendant must show that the witness is available and willing to testify). Although well-established due-process norms might well require a different result if the IJ or the government caused Parker's unavailability, *see United States v. Pierce*, 62 F.3d 818, 832 (6th Cir. 1995), Singh concedes that neither was responsible for Parker's failure to appear. For these reasons, due process did not require the IJ to give Singh a second opportunity to call Parker as a witness, and Singh's first due-process claim is without merit.

The same is true for Singh's second claim that due process required the IJ to consider his late-filed packet of affidavits. As we have explained, "IJs may set and extend time limits for filing of applications and related documents," "the setting and extension of deadlines is discretionary, not mandatory," and an IJ's refusal to extend a deadline does not by itself violate due process. *Ventura-Reyes v. Lynch*, 797 F.3d 348, 361 (6th Cir. 2015) (citing 8 C.F.R. § 1003.31(c)). Singh does not allege that the IJ gave him insufficient time to procure the six affidavits in his "evidence packet" within the twenty-month period between his receipt of notice of the submission deadline and the June 2012 hearing. *Cf. Zhang v. Gonzales*, 432 F.3d 339, 346 (5th Cir. 2005). Nor does he allege that due process required the IJ to give him notice of the need to submit corroborating evidence. *Cf. Gaye v. Lynch*, 788 F.3d 519, 530 (6th Cir. 2015). "IJs are accorded wide latitude in calendar management," *Umarov v. Lynch*, 623 F. App'x 22, 24 (2d Cir. 2015) (quoting *Morgan v. Gonzales*, 445 F.3d 549, 551 (2d Cir. 2006)), and in the absence of any indication that the IJ's deadline denied Singh a fair opportunity to present his evidence in the June 2012 hearing, Singh cannot show that the IJ abused her discretion or denied him due process by refusing to extend that deadline, *see ibid.*

IV

Singh also claims that the IJ's adverse-credibility determination is not supported by substantial evidence. We review the BIA's factual findings, including any determination concerning the credibility of witnesses, for substantial evidence. *Khozhaynova*, 641 F.3d at 191. When reviewing for substantial evidence, we must accept the BIA's factual findings "unless any reasonable adjudicator would be compelled to conclude to the contrary." *Ibid.* (quoting 8 U.S.C. § 1252(b)(4)(B)). Where, as here, the BIA has adopted and supplemented the IJ's reasoning, we review the BIA's opinion in conjunction with the IJ's. *See Khalili v. Holder*, 557 F.3d 429, 435 (6th Cir. 2009).

Singh argues that he testified credibly, and makes several arguments for why the IJ's adverse-credibility determination is not supported by substantial evidence. First, Singh argues that the IJ erroneously based her adverse-credibility finding upon the mistaken assumption that Akali Dal Mann is a different party than Shiromani Akali Dal Mann. Though Singh is correct that there was some confusion at the hearing about the various names of Akali Dal Mann and the relationship between Akali Dal Mann and Akali Dal Badal, and that the IJ briefly referred to that confusion in her opinion, the confusion was caused by Singh's own inconsistent testimony. Although Singh at some points stated that Akali Dal Mann is simply another name for the party formally known as Shiromani Akali Dal Mann, at another he testified that "Akali Dal Mann is the main party. And then there are two [subsidiary] factions: Shiromani Akali Dal Mann, which is one party; and Shiromani Akali Dal Badal, which is another party."

Singh also suggests that the BIA erred when it stated that Singh's testimony was inconsistent with the State Department reports. We agree that the State Department reports are not necessarily "inconsistent" with Singh's account of torture at the hands of Indian authorities.

12

Indeed, the State Department Country Report documents widespread abuse of prisoners and extrajudicial killings in India. But the absence of any mention of abuses in Punjab or against Sikhs or members of Akali Dal Mann is somewhat surprising given Singh's claim of widespread oppression in Punjab. Notably, the Country Report specifically mentions human-rights abuses in "Jammu and Kashmir, the Northeastern States, and the Naxalite belt," but not in Punjab, a state where Sikhs are in the majority.

In any event, neither the confusion over nomenclature nor the consistency of Singh's testimony with State Department reports was truly material to the IJ's adverse-credibility finding, the "primary basis" of which was Singh's testimony about the letter from Akali Dal Mann. On this point, Singh clearly gave inconsistent testimony. At the hearing, Singh was asked how he obtained the letter from Akali Dal Mann. Singh responded that he brought it with him from India:

> COUNSEL FOR DHS: How did you get th[e] letter, sir?
> SINGH: I brought it with me from India.
> COUNSEL FOR DHS: Okay. When did you get that letter, sir?
> SINGH: I brought it along with me when I came to the U.S.A.

When confronted with the fact that the letter bore an Ohio address, Singh changed his story and stated that he had obtained the letter by mail:

> COUNSEL FOR DHS: Can you explain, sir, . . . how this letter indicates that you reside . . . in . . . Ohio?
> SINGH: I told [Akali Dal Mann] to use this address when I needed that document. First they wrote my home address in India. And then later, they changed the address.
> COUNSEL FOR DHS: Sir, okay. First of all, sir you said that this is the document that you received the day that you signed up for [Akali Dal Mann].
>
> . . .

> SINGH:  When I came here [to the] U.S.A. I called [Akali Dal Mann] on [the] telephone and I asked them if they can give me an affidavit because [they] told me at the time of recruitment that if I go to any other country I can get asylum.
> COUNSEL FOR DHS:  So, [Akali Dal Mann] then, after you came to the United States[,] they then edited this letter that you submitted to the Court and then sent it over here?
> SINGH:  Yes.

This inconsistency supports the IJ's and BIA's determinations that Singh did not testify credibly. In addition, the fact that Singh asked someone to mail the letter from India to the United States casts doubt upon the veracity of Singh's avowed fear that asking others to mail affidavits to the United States would endanger their security.

Singh protests that the IJ's and BIA's concerns over the authenticity of the letter were misplaced, positing that both "should have taken Judicial Notice of the contents of [the Akali Dal Mann] letter as [the IJ] has presided over several cases of members of the [Akali Dal Mann] and every letter signed by its president, Simranjit Singh Mann, provides the same information." Pet'r Br. 27. But aside from Singh's testimony and an unsupported claim in his appellate brief, there is no evidence in the record suggesting that Akali Dal Mann regularly gives new members letters that recommend that they receive asylum in a foreign country. More importantly, even if the IJ had taken notice of this alleged fact, Singh does not explain why he gave inconsistent testimony about how he obtained the letter that he ultimately submitted to the IJ.

In short, because Singh gave inconsistent testimony about the relationship between Akali Dal Mann and Shiromani Akali Dal Mann—which he now asserts are one and the same, *see* Pet'r Br. 22—and about how he obtained the copy of the letter from Akali Dal Mann, he cannot show that every reasonable adjudicator would be "compelled to conclude" that he testified credibly.  8 U.S.C. § 1252(b)(4)(B).

V

Lastly, the BIA's holding that Singh failed to prove eligibility for withholding of removal or relief under the CAT is supported by substantial evidence. In order to prove entitlement to withholding of removal, an alien must show a clear probability that he would be subject to persecution if returned to the country in question. *Camara v. Holder*, 705 F.3d 219, 225 (6th Cir. 2013); *Almuhtaseb v. Gonzales*, 453 F.3d 743, 749 (6th Cir. 2006). To demonstrate a "clear probability," the applicant must show that it is more likely than not that he will be persecuted upon removal. *Cruz-Samayoa v. Holder*, 607 F.3d 1145, 1150–51 (6th Cir. 2010). Under the INA, a showing that an applicant was persecuted on account of a protected ground—including political opinion—in the past gives rise to a rebuttable presumption of persecution on return. 8 C.F.R. § 208.16(b)(1)(i). An alien may also establish a withholding-of-removal claim by demonstrating "that he would be persecuted in the future due to, *inter alia*, his political opinions." *Abuasfour v. Holder*, 364 F. App'x 200, 203 (6th Cir. 2010). To prevail on a claim for relief under the CAT, an alien must show that "he would more likely than not be subjected to torture" at the instigation of, or with the acquiescence of, government officials in the country of removal. *Ramaj v. Gonzales*, 466 F.3d 520, 532 (6th Cir. 2006); *see also* 8 C.F.R. § 208.18(a)(1).

We review claims for withholding of removal and relief under the CAT under the same deferential "substantial evidence" standard that applies to our review of the IJ's credibility determinations. *See Goswami v. Holder*, 598 F. App'x 430, 431–32 (6th Cir. 2015). As mentioned above, in order to reverse the BIA's decision under this standard, we must find that the evidence "not only supports a contrary conclusion, but compels it." *Ka v. Gonzales*, 236 F.

App'x 189, 191 (6th Cir. 2007). Our review of the record does not so strongly point to the conclusion that Singh is entitled to withholding of removal or relief under the CAT.

In this case, a rational trier of fact could certainly share the IJ's and BIA's skepticism of Singh's membership in Akali Dal Mann on the ground that political parties do not ordinarily give new members documents suggesting that they merit asylum in a different country. Moreover, even if the Akali Dal Mann letter had conclusively established that Singh was a member, nothing in that letter confirms Singh's statement that he took an active role in the group, an assumption that Parker appears to have relied on when she concluded that Singh would likely "have difficulties with the police and other authorities" if returned to Punjab. Nor is the reliability of Parker's declaration beyond doubt: Parker stated that "the current Punjabi Chief Minister is of the Shiromani Dal Mann faction" and that "Shiromani Dall [sic] Mann" is a "faction of the Akali Dal Mann" party, both of which Singh now maintains are not true. *See* Pet'r Br. 22.

As Singh's eventual procurement of affidavits from his uncle and others in India confirms, the IJ and BIA reasonably concluded that Singh could have obtained more evidence to corroborate his claims. *See Lin v. Holder*, 565 F.3d 971, 977 (6th Cir. 2009). In the context of his failure to do so, the Akali Dal Mann letter and Parker's declaration—neither of which necessarily provides reliable information, describes Singh's role in Akali Dal Mann, or explains why Singh could not safely live in another part of India—do not compel the conclusion that Singh was or will be persecuted in India. For the same reasons, these two documents do not compel the conclusion that it is more likely than not that Singh would be tortured at the instigation of Indian authorities or with their consent. Accordingly, we may not grant Singh's petition on the ground that he is entitled to withholding of removal or relief under the CAT.

## VI

In this appeal from the BIA, Varinder Singh argues that the BIA erroneously concluded that he failed to timely file an asylum application and that the IJ denied him due process by refusing to reopen the record after conducting an evidentiary hearing. Singh also disputes the BIA's determinations that he failed to prove entitlement to withholding of removal or relief under the CAT. None of Singh's claims warrant relief. First, we lack jurisdiction over Singh's claim that he timely filed an asylum application. Second, the IJ did not deny Singh due process of law because Singh had a full and fair opportunity to present favorable evidence. Third, because Singh gave contradictory testimony and provided only corroborating evidence that the BIA reasonably considered unreliable, the BIA did not err when it held that Singh is not eligible for withholding of removal or relief under the CAT. For these reasons, we DENY Singh's petition for review.