# United States Court of Appeals
## For the First Circuit

No. 15-2398

NATIONAL LABOR RELATIONS BOARD,

Petitioner,

v.

LILY TRANSPORTATION CORPORATION,

Respondent.

APPLICATION FOR ENFORCEMENT OF AN ORDER
OF THE NATIONAL LABOR RELATIONS BOARD

Before

Kayatta, Circuit Judge,
Souter, Associate Justice,[*]
and Selya, Circuit Judge.

Jared David Cantor, Counsel, with whom Kira Dellinger Vol, Supervising Attorney, Richard F. Griffin, Jr., General Counsel, Jennifer Abruzzo, Deputy General Counsel, John H. Ferguson, Associate General Counsel, and Linda Dreeben, Deputy Associate General Counsel, were on brief, for petitioner.
Kay H. Hodge, with whom Alan S. Miller, Katherine D. Clark, and Stoneman, Chandler & Miller LLP were on brief, for respondent.

March 31, 2017

* Hon. David H. Souter, Associate Justice (Ret.) of the Supreme Court of the United States, sitting by designation.

**SOUTER**, **Associate Justice**.    The    National    Labor Relations Board applies for enforcement of its bargaining order against    Lily    Transportation    Corporation.        We    grant    the application.

## I.

Pumpernickel Express, Incorporated, carried automotive parts from warehouses in Mansfield, Massachusetts, to Toyota and Chrysler dealerships in the region.  Pumpernickel's drivers were represented by the International Association of Machinists and Aerospace Workers, AFL-CIO, District Lodge 15, Local 447.

In October 2013, Pumpernickel filed for bankruptcy, and Lily subsequently obtained the portion of Pumpernickel's business that involved distributing parts for Toyota.  Lily hired many of Pumpernickel's former employees, including drivers, and began operations in November 2013.  The Union promptly demanded that Lily recognize it as the drivers' bargaining representative, but Lily refused.  Lily later produced signed statements it allegedly had received from a majority of the drivers saying that they no longer wished to be represented by the Union.

The Union filed an unfair labor practice charge with the National Labor Relations Board, claiming that Lily's refusal to bargain violated Sections 8(a)(1) and 8(a)(5) of the National

Labor Relations Act.[1]  After a hearing, the Administrative Law Judge found that in distributing for Toyota, Lily was a "successor employer" to Pumpernickel, that is, an employer who "makes a conscious decision to maintain generally the same business and to hire a majority of its employees from the predecessor," Fall River Dyeing & Finishing Corp. v. NLRB, 482 U.S. 27, 41 (1987); accord Asseo v. Centro Médico Del Turabo, Inc., 900 F.2d 445, 450-51 (1st Cir. 1990).  The Judge held that Lily, as a successor, was required under Fall River to recognize and bargain with the Union, and rejected Lily's position that its refusal to bargain about terms of employment in the affected unit was justified by the signed employee statements of repudiation.  Rather, the Judge explained, under the "successor bar doctrine," as adopted by the Board in UGL-UNICCO Service Co., 357 N.L.R.B. 801 (2011), an incumbent union is entitled to represent a successor employer's employees for a reasonable period of time for bargaining before its majority status may be questioned.

The Board affirmed, agreeing with the Administrative Law Judge that insofar as Lily was a successor employer, it was

---

[1] Section 8(a)(1) makes it an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise of [their organizational] rights."  29 U.S.C. § 158(a)(1).  Under Section 8(a)(5) it is an unfair labor practice for an employer "to refuse to bargain collectively with the representatives of his employees."  Id. § 158(a)(5).

obligated to bargain with the Union, and that <u>UGL</u> barred Lily from challenging the Union's majority status until a reasonable period of time for bargaining had elapsed. The Board accordingly ordered Lily to recognize and bargain with the Union.

The Board now asks this Court to enforce its order over Lily's objection. Lily submits that the Board erred in relying on <u>UGL</u>'s successor bar doctrine and that we should instead substitute only a rebuttable presumption of majority union support under the rule of <u>MV Transportation</u>, 337 N.L.R.B. 770 (2002), of the kind the Board adopted and enforced prior to its rejection in <u>UGL</u>. Lily also says that it has rebutted that presumption with its documentary evidence that a majority of the affected drivers no longer support the Union.

## II.

Lily's objection to the successor bar implicates some doctrinal history. The National Labor Relations Act provides neither bar nor presumption to address the unstable labor climate that can develop in successor employment, a silence the Board has seen as leaving a statutory gap needing to be filled. In 1999, it adopted a successor bar partially resembling its present iteration, in <u>St. Elizabeth Manor, Inc.</u>, 329 N.L.R.B. 341 (1999). There, the Board held that "once a successor employer's obligation to recognize an incumbent union attaches

[under Fall River], the union is entitled to a reasonable period of time for bargaining without challenge to its majority status." Id. at 341. The Board recognized that it was overruling its previous decision of some twenty-four years earlier in Southern Moldings, Inc., 219 N.L.R.B. 119 (1975), which had held that at the beginning of a successorship situation a union generally enjoys only a rebuttable presumption of continuing majority membership support. St. Elizabeth Manor, 329 N.L.R.B. at 341.

Just three years later, though, in MV Transportation, 337 N.L.R.B. 770, the Board overturned St. Elizabeth Manor in favor of the rebuttable presumption. The Board declared that the presumption represented the appropriate balance between the two "fundamental purposes" of the National Labor Relations Act, that is, "employee freedom of choice and the maintenance of stability in bargaining relationships." Id. at 772-73. In some circumstances, it said, the successor bar could preclude employees from making a choice of representation "for as long as several years," id. at 773, and as an example it cited the possible combination of the successor bar and a bar running for three years from the execution of a collective bargaining agreement, id. One Board member dissented, however, citing the dramatic increase in the number of corporate mergers and acquisitions over the previous twenty-five years, and taking

- 5 -

that as a reason to argue that "the interest of stability should be given greater . . . weight in shaping national labor policy." Id. at 776-77 (Member Liebman, dissenting).

Nine years afterwards, in UGL, 357 N.L.R.B. 801, the Board changed course again, citing the figures from the MV Transportation dissent along with current statistics. It observed that successorship situations had become increasingly common owing to a rising level of corporate merger and acquisition activity, id. at 801 & n.4, 805 & n.17, and held that the bar "better achieves the overall policies of the Act, in the context of today's economy," than a rebuttable presumption does, id. at 801. The Board did not, however, merely reinstate the St. Elizabeth Manor bar, which it modified in two respects. It defined the previously unspecified "reasonable period" of time for bargaining after the successor's arrival as being between six months and a year, depending on the circumstances. Id. at 808-09. The Board also provided a special variant of the bar for successorship situations that involve successorship followed by execution of a collective bargaining agreement. It reduced that latter bar's duration to two years, so as to mitigate the limitation on employee choice (or other challenges) that could previously have resulted from adding the contract and successor bars together. Id. at 810.

It is the successor bar thus doubly modified that is at stake here.

## III.

Lily attacks the Board's reliance on UGL's successor bar on two grounds: (1) that a bar to challenging the union's support, as distinguished from a rebuttable presumption, deserves no judicial deference under Chevron U.S.A. Inc. v. Nat. Res. Def. Council, Inc., 467 U.S. 837 (1984), because it flatly violates employees' rights under Section 7 of the National Labor Relations Act to choose or reject union representation;[2] and (2) that the Board's irregularity in successor cases, switching back and forth between rebuttable presumption and bar rules, most recently in the St. Elizabeth Manor, MV Transportation, and UGL sequence, independently disentitles the current bar rule to the judicial deference that an otherwise lawful administrative rule of decision would deserve if consistently applied.

---

[2] Section 7 provides that

> [e]mployees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized [elsewhere in] this title.

29 U.S.C. § 157.

The claim of a Section 7 violation on these facts is untenable. To be sure, we can imagine bars on challenges to unions so patently arbitrary as to run afoul of the Section 7 guarantee; a ten-year bar following certification, say. The bar choice here, however, is for a newly limited period (alone or in tandem with the contract bar), a fact that Lily disregards on the apparent absolutist theory that duration is not of the essence: in its view, any bar, no matter its length, would unlawfully burden Section 7 rights. But the assumption that a bar per se patently trespasses on Section 7 while some rebuttable presumptions would not does not survive scrutiny. If we compare a two-year bar with a two-year presumption, we may easily suspect that the burdens of the bar on employees' Section 7 rights would be demonstrably the heavier of the two alternatives and require a comparatively more powerful justification to fall within the zone of reasonable agency action. But if the comparison is between a six-month bar and a rebuttable presumption for the same period, the bar could turn out to be the lighter of the two, given the added burden of rebuttal that would come with the presumption, which could increase litigation time and expense, as against a proceeding free of the presumption. Thus, Lily's argument that any bar is forbidden because it burdens the exercise of Section 7 rights is in tension with its favored alternative of a rebuttable

presumption, which does the same and could be the more onerous of the two depending on the time period involved.

The Board is thus within the zone of reason in rejecting a neat, categorical distinction between the two species of rules. Each serves the obviously legitimate objective of stability in labor and management relations during a period in which the entrance of new management can destroy the prior modus operandi among union, employer, and employees. See Fall River, 482 U.S. at 39-40. In those circumstances, for example, there may well be a risk that employees will, rightly or wrongly, blame the incumbent union for the demise or departure of the old employer, or will fear that support for a union will jeopardize jobs with the new boss. See id. Thus, some limited discouragement of an unduly hasty reexamination of a prior Section 7 choice serves to provide time for second thoughts, a subject the statute does not directly address in successor cases, but which falls within its "underlying purpose." Brooks v. NLRB, 348 U.S. 96, 103 (1954); accord NLRB v. Beverly Enters.-Mass., Inc., 174 F.3d 13, 32 (1st Cir. 1999). Since neither of the competing means to further this legitimate objective, then, is categorically forbidden, the only remaining question in this case goes to the adequacy of the Board's justification for deciding to impose the newly adjusted bar rule, with particular attention to Lily's claim that the Board

has undercut its entitlement to deference by blowing hot and cold in its choices of successor rules.

This inconsistency challenge to UGL calls to the fore the Supreme Court's recent leading case on agency reversal of prior interpretive doctrine, FCC v. Fox Television Stations, Inc., 556 U.S. 502 (2009); see also Encino Motorcars, LLC v. Navarro, 136 S. Ct. 2117, 2125-26 (2016) (discussing Fox).[3] The Court in Fox was unanimous in its acceptance of the view, often expressed, that an agency is not forever bound by an earlier resolution of an interpretive issue, but that a change must be addressed expressly, at least by the agency's articulate recognition that it is departing from its precedent. See Fox, 556 U.S. at 514-15; id. at 535 (Kennedy, J. concurring); id. at 549 (Breyer, J., dissenting); see also Nat'l Ass'n of Home Builders v. EPA, 682 F.3d 1032, 1038 (D.C. Cir. 2012) (stating that the "core requirement that Fox makes clear an agency must meet when changing course" is to "'provide reasoned explanation for its action,' which 'would ordinarily demand that it display awareness that it *is* changing position'" (quoting Fox, 556 U.S. at 515)).  There was disagreement between majority and dissent, however, on the detail necessary to justify an overruling decision, compare Fox, 556 U.S. at 514-16, with id. at 549-50

---

[3] Because the authorities on which Lily rests for its inconsistency challenge to UGL antedate Fox, there is no need to discuss their holdings.

(Breyer, J., dissenting), with Justice Kennedy's view (generally in the majority) taking the position that reversing course requires reasoned explanation, id. at 535 (Kennedy, J., concurring). Nonetheless, all views were in accord that an about-face on a rule owing to facts changed from those underlying the prior view requires that the new facts be addressed explicitly by reasoned explanation for the change of direction. See id. at 515-16 (majority opinion); id. at 535-36 (Kennedy, J, concurring); id. at 550-51 (Breyer, J., dissenting); see also Modesto Irrigation Dist. v. Gutierrez, 619 F.3d 1024, 1034 (9th Cir. 2010) (describing Fox as holding that "an agency [must] provide a greater justification for changing a policy" when the new policy rests upon changed facts).

This is such a case. Changes from the significant factual bases of the earlier rule were essential to the Board's departure from precedent in UGL, where two such developments received attention.

The first concerned corporate business activity, as the Board in UGL emphasized the fact stressed by the dissenting Board member in MV Transportation: merger and acquisition activity was much increased from the quieter heyday of the presumption rule of Southern Moldings. UGL, 357 N.L.R.B. at 801. In UGL, the Board majority brought the supporting statistics up to date, and showed, in this respect, that the

volume of mergers and acquisitions had not substantially declined since the MV Transportation majority ignored them. Id. at 805 n.17. The UGL Board noted that, in 1975, merger and acquisition announcements numbered 2,297, with transactions valued at $11.8 billion; that in 2000, two years before MV Transportation was decided, the numbers had increased to 9,566 and $1.3 trillion; and, finally, that following a drop after 2000, the numbers had "ris[en] again, peaking in 2007, before another decline, which now seems over." Id. The Board also cited an article claiming that conditions were ripe for a "[b]oom" in mergers and acquisitions in 2011, the year in which the UGL Board was writing. Id. (citing Frank Aquila, Conditions are Ripe for an M&A Boom in 2011, Bloomberg Business Week (Dec. 22, 2010)).

Lily tries to disparage the Board's reliance on these statistics by asking what they are supposed to prove. But we do not think the decision gets a failing grade for dereliction in spelling out the point the Board was making, since it seems clear enough that the corporate activity in question carries significant consequences under the Fall River successor rule. The greater the number of mergers and acquisitions, the greater the number of those that will produce a Fall River successor employer. The greater the number of successor situations with unionized employees, the greater the potential volatility in

- 12 -

union-management relationships across the national labor market. The greater the level of that instability, the greater the likelihood of precipitate disruption in litigation challenging union support during the unsettled period with the new employer. This risk would not only affect the actual employment relations in the market overall owing to the quantity of successorships, but by the same token would also portend a heavier burden on the administrative law machinery, including the Board itself, in administering the National Labor Relations Act.

These obviously apparent consequences answer not only Lily's objection to the reliance on the statistics, but its attempt to distance this case from their threat by pointing out that its own successor status follows neither a merger nor an acquisition. But how the fact of successor employment comes about is not to the point. What does matter is simply the probable volume of hasty challenges to union support. It is this that makes the merger and acquisition facts relevant in reexamining the MV Transportation rule and in concluding that a bar would serve stability in labor relations better in a market likely to be fraught with higher numbers of upsets than in the world of forty years ago.[4]

---

[4] We are mindful of the Supreme Court's observation in Encino Motorcars that a reviewing court passes on the adequacy of an agency's reasoning, without authority to inject new reasons of its own. 136 S. Ct. at 2127 (citing Motor Vehicle

The UGL Board relied on another set of changed facts in justifying its return to a successor bar. These facts are notable in that they were actually subject to the Board's control, which the Board exercised by modifying its own rules in respects not independently challenged here. The MV Transportation majority justified its rejection of a bar rule by showing how long a period of union immunity to challenge might stretch out if the St. Elizabeth Manor successor bar period of a "reasonable" but unspecified time was combined with other bars. The MV Transportation Board explained in this way:

> It is possible . . . that the successor bar could preclude the employees' exercise of their Section 7 rights for as long as several years. For example, a successor employer could engage in bargaining with the incumbent union and, prior to the expiration of a "reasonable period of time," reach agreement with the union on a new collective-bargaining agreement, which then would serve as a bar to a representation petition for the duration of the contract, up to a period of 3 years. Moreover, the incursion on the employees' freedom of choice could be even more severe (up to 6 years) if the union and the predecessor employer were parties to a collective-bargaining agreement that served to bar any employee efforts to remove or replace the Union prior to the successor's assumption of operations.

---

Mfrs. Ass'n, Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983)); see also River St. Donuts, LLC v. Napolitano, 558 F.3d 111, 115 (1st Cir. 2009) ("This Court cannot 'attempt to supply a reasoned basis for the action that the agency itself has not given.'" (quoting Citizens Awareness Network v. U.S. Nuclear Regulatory Comm'n, 59 F.3d 284, 291 (1st Cir. 1995))). We regret that the Board did not do a more extensive job spelling out what it meant, but because we think that the point of its reliance on statistical fact justification is so obvious, we hold the explanation merely laconic, not inadequate.

337 N.L.R.B. at 773.  The Board in <u>UGL</u> treated this as a serious objection, <u>see</u> 357 N.L.R.B. at 808, to which it responded by decreeing the following modifications of bar rules as previously imposed.  First, as to the successor bar, the Board tightened the formerly undefined "reasonable period" of time, setting it at a six-month minimum but no longer than a year, depending on circumstances.  <u>Id.</u> at 808-09.  Second, the Board modified the contract bar doctrine, holding that where a first contract is reached between the successor employer and the incumbent union within the successor bar's newly specified reasonable time, and where there was no open period permitting the filing of a union challenge petition during the final year of the predecessor employer's bargaining relationship with the union, the contract-bar period would be a maximum of two years, instead of three. <u>Id.</u> at 810.

Thus, in responding to the <u>MV Transportation</u> majority objection, the Board changed the consequences the earlier rules might produce.  It did not merely revert back to the interpretive regime imposed or assumed by <u>St. Elizabeth Manor</u>, but devised a new scheme to produce a shorter period of union protection and a correspondingly earlier opportunity to challenge the ensconced union, whether by employees in the

- 15 -

exercise of Section 7 rights, or by the successor or a competing union.

In sum, we find that the Board has explained its reason for changing course and has marshalled new factual support for its doctrinal move. It brought up to date the commercial reality ignored by the MV Transportation majority and changed the factual consequences of the successor bar by modifying the terms on which the bar was previously imposed. The result is an adequately explained interpretive change reflecting the Board's judgment of a reasonable balance between the Section 7 right of employee choice and the need for some period of stability to give the new relationships a chance to settle down.

The need to strike such a balance is not itself challenged, and hardly could be. We see no cause to doubt that the Board's position taken here is within the scope of reasoned interpretation and thus subject to judicial deference under Chevron, 467 U.S. at 842-45.

**IV.**

Lily raises three additional challenges to the successor bar, and we reject them. Lily contends that the bar is inconsistent with references to a presumption rule in Fall River and NLRB v. Burns International Security Services, Inc., 406 U.S. 272 (1972). But the language in those cases on which

- 16 -

Lily relies simply describes the legal landscape at the time. See Fall River, 482 U.S. at 41 & n.8; Burns, at 278-79, 279 n.3. Neither case holds that a rebuttable presumption, rather than a bar, is required in a successorship situation. Second, Lily argues that the bar is inconsistent with the Act's requirement, in Section 10, that the Board support its factual findings with "substantial evidence on the record," 29 U.S.C. § 160(e)-(f). The successor bar, however, is a legal rule, not a factual finding, and therefore the substantial evidence requirement is not on point. Finally, Lily argues that the bar (and, in fact, any bar) is inconsistent with this court's holding in Big Y Foods, Inc. v. NLRB, 651 F.2d 40 (1st Cir. 1981). That argument, too, fails, as Big Y concerned the Act's requirement, not at issue here, that the Board determine the appropriate bargaining unit "in each case." Id. at 45-46 (quoting 29 U.S.C. § 159(b)).

## V.

Because we see no error in the Board's adherence to UGL's successor bar doctrine, we need not reach Lily's arguments that it would prevail if that doctrine were rejected in favor of a rebuttable presumption of majority support for the Union. The Board's application for enforcement of its bargaining order against Lily is granted.