# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued September 21, 2023          Decided February 27, 2024

No. 22-1163

HOSPITAL MENONITA DE GUAYAMA, INC.,
PETITIONER

v.

NATIONAL LABOR RELATIONS BOARD,
RESPONDENT

———

Consolidated with 22-1180

———

On Petition for Review and Cross-Application
for Enforcement of an Order of
the National Labor Relations Board

———

*Patrick M. Muldowney* argued the cause for petitioner. With him on the briefs were *Ángel Muñoz Noya* and *Gerardo De Jesús*.

*Heather Beard*, Senior Attorney, National Labor Relations Board, argued the cause for respondent. With her on the brief were *Jennifer Abruzzo*, General Counsel, *Peter Sung Ohr*, Deputy General Counsel, *Ruth E. Burdick*, Deputy Associate General Counsel, *David Habenstreit*, Assistant General Counsel, and *Elizabeth Heaney*, Supervisory Attorney.

Before: HENDERSON and KATSAS, *Circuit Judges*, and EDWARDS, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* EDWARDS.

Concurring opinion filed by *Circuit Judge* KATSAS.

EDWARDS, *Senior Circuit Judge*: This case emanates from actions taken by Hospital Menonita de Guayama, Inc. ("Petitioner") after it acquired Hospital San Lucas Guayama ("Hospital San Lucas") and became a successor employer with an obligation to recognize and bargain with the Unidad Laboral de Enfermeras (OS) y Empleados de la Salud ("the Union"). When Petitioner acquired Hospital San Lucas, the Union represented five distinct bargaining units of employees. Over the course of five months after the acquisition, Petitioner first failed and refused to bargain in good faith with the Union. It then serially withdrew recognition from the Union as the employees' collective bargaining agent in each of the five units.

The Union filed unfair labor practice charges with the National Labor Relations Board ("Board" or "NLRB") and the Board's General Counsel then filed a complaint against Petitioner. The complaint alleged that Petitioner had violated Sections 8(a)(5) and (1) of the National Labor Relations Act ("NLRA" or "Act"), 29 U.S.C. § 158(a)(1), (5). A hearing was held before an Administrative Law Judge ("ALJ"), who determined that Petitioner had violated the NLRA by withdrawing recognition from the Union, failing and refusing to bargain in good faith with the Union, unilaterally changing the terms and conditions of employment, and withholding information relevant to the Union's bargaining duties. *See*

*Hosp. Menonita de Guayama, Inc.*, No. 12-CA-214830, 2019 WL 2354716 (N.L.R.B. Div. Judges May 30, 2019) ("ALJ Decision"). In reaching his decision, the ALJ relied on the Board's "successor bar" rule, which holds that an incumbent union enjoys an irrebuttable presumption of majority status for a reasonable period of time following the successor employer's voluntary recognition of the union. *Id*.

The Board largely adopted the findings and conclusions of the ALJ, with one member dissenting. *Hosp. Menonita de Guayama, Inc.*, 371 N.L.R.B. No. 108, at 1 (June 28, 2022). The Board denied Petitioner's request to overrule the successor bar rule and afford incumbent unions in successorship situations only a rebuttable presumption of majority support. *Id*. at 3-4. The Board carefully explained its adherence to the successor bar rule, noting that its decade-old decision implementing the rule was soundly reasoned and vindicated by subsequent legal and economic developments. *Id*. at 5-6. The Board also noted that each of the arguments raised by the dissent had been carefully considered and rejected by the Board in a prior decision. *Id*.

In its petition for review, Petitioner asks this court to overturn the successor bar rule. We decline the invitation and deny the petition for review. On the facts presented, the Board's application of the successor bar rule was consistent with established Board precedent, permissible, and reasonable. The ALJ's factual findings, which the Board adopted, are supported by substantial evidence. The Board's conclusion that Petitioner refused to bargain in good faith with the Union and engaged in multiple unfair labor practices follows directly from established Board precedent. Indeed, based on the record in this case, there can be no doubt whatever that Petitioner was guilty of the unfair labor practices as charged. The only issue we consider is whether the Board erred in applying established

precedent and enforcing the successor bar rule to preclude Petitioner's challenges to the Union's majority support. After carefully reviewing the record before us, we find that the Board more than adequately justified its application of the successor bar and the factual findings before us fall comfortably within the rule's ken. We find no merit in Petitioner's arguments to the contrary.

## I.     BACKGROUND

## A.  Legal and Statutory Background

Section 7 of the NLRA grants employees "the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining," as well as "the right to refrain from any or all of such activities." 29 U.S.C. § 157. Section 8(a)(1) makes it an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed" by the NLRA. 29 U.S.C. § 158(a)(1). Similarly, Section 8(a)(5) labels as an unfair labor practice an employer's "refus[al] to bargain collectively with the representatives of [one's] employees." *Id*. § 158(a)(5). When an employer violates Section 8(a)(5), it concurrently violates Section 8(a)(1). *Enter. Leasing Co. of Fla. v. NLRB*, 831 F.3d 534, 546 (D.C. Cir. 2016).

The NLRB is tasked with enforcing the NLRA. And the Supreme Court "has emphasized often that the NLRB has the primary responsibility for developing and applying national labor policy." *NLRB v. Curtin Matheson Sci., Inc.*, 494 U.S. 775, 786 (1990). Accordingly, the Court has directed lower federal courts reviewing a Board decision to "uphold a Board rule as long as it is rational and consistent with the [NLRA],

even if we would have formulated a different rule had we sat on the Board." *Id*. at 787 (citations omitted).

As part of its authority to interpret and enforce the NLRA, the Board has adopted a "successor bar" rule. The Board first used the term "successor bar" in *St. Elizabeth Manor, Inc.*, 329 N.L.R.B. 341 (1999), which held that, "once a successor's obligation to recognize an incumbent union has attached (where the successor has not adopted the predecessor's contract), the union is entitled to a reasonable period of bargaining without challenge to its majority status through a decertification effort, an employer petition, or a rival petition." *Id.* at 344 (footnote omitted). In reaching its conclusion, the Board reasoned as follows:

> In both initial recognition and successorship situations, the employer has incurred a recognitional obligation by a voluntary act, either by extending recognition to a union after ascertaining demonstrated majority support or by hiring a sufficient number of a predecessor's employees to constitute a majority and thereby incurring a bargaining obligation . . . . In both situations, because the employer and the union are embarking on a new relationship, all the issues are likely to be open. Thus, bargaining in both situations is likely to present a greater challenge than bargaining between partners in an established relationship who are negotiating a new contract after having lived under an earlier contract or contracts so that only selected issues are likely to be on the table.

> Moreover, as in the case of voluntary recognition following an initial campaign, parties in a successorship relationship are in a stressful transitional period. Although in many cases the

employees may have had adequate time to determine whether the incumbent union was effective in representing them in negotiations with the predecessor employer, they have not had the opportunity to learn if the incumbent will be effective with the successor. The employees may fear that the successor employer will not want the union or would give them a better deal without it. This is particularly true if the employer has exercised its prerogative to set initial terms and conditions of employment that differ from those that employees have enjoyed pursuant to the union's collective-bargaining relationship with the predecessor. With mergers and acquisitions commonplace, and with publicized downsizings, restructurings, and facility closings accompanying them, employees' concern over the security of their continued employment and working conditions is understandably increased in the course of any change in ownership. Thus, although at the time of transition there may be no indication that the employees had become dissatisfied with their union, anxiety about their status under the successor may lead to employee disaffection before the union has had the opportunity to demonstrate its continued effectiveness.

Furthermore, the successor may be reluctant to commit itself wholeheartedly to bargain for a collective-bargaining agreement with the incumbent union when at any time following the recognition, the union's majority status may be attacked. A reasonable period free of outside distractions will permit the parties to attempt to bring their new relationship to fruition, i.e., to engage in the process of collective bargaining.

*Id.* at 342-43 (footnote omitted).

The Board's decision in *St. Elizabeth* did not write on a blank slate. In 1975, the Board had held that, absent a successor employer's adoption of an existing collective bargaining agreement, an incumbent union was entitled only to a rebuttable presumption of majority support following a successor's voluntary recognition of the union. *See Southern Moldings, Inc.*, 219 NLRB 119, 119 (1975). Six years later, the Board modified its position and made the presumption irrebuttable without expressly overruling – or even mentioning – its decision in *Southern Moldings*. *See Landmark Int'l Trucks, Inc.*, 257 N.L.R.B. 1375, 1375 (1981). The Sixth Circuit denied enforcement of the Board's order, finding "no basis" for the Board's holding. *Landmark Int'l Trucks, Inc. v. NLRB*, 699 F.2d 815, 818 (6th Cir. 1983). The court posited that, "where the union has represented the employees for a year or more a change in ownership of the employer does not disturb the relationship between employees and the union." *Id*. Accordingly, "[a] successor's duty to continue recognition . . . is no different from that of any other employer after the certification year expires." *Id*. Following the Sixth Circuit's decision, the Board returned to a rebuttable presumption of majority status for an incumbent union in a successorship situation. *Harley-Davidson Transp. Co.*, 273 N.L.R.B. 1531, 1531 (1985).

The Board subsequently overruled *Southern Moldings* and *Harley-Davidson* when it decided *St. Elizabeth Manor. See St. Elizabeth*, 329 N.L.R.B. at 344. The Board's decision in *St. Elizabeth Manor* expressly addressed the Sixth Circuit's reasoning in *Landmark*, labeling it "faulty." *Id*. at 342. As noted above, the Board offered its own account of why employees in a successorship situation "must be given a

reasonable opportunity to determine the effectiveness of the union's representation, free of any attempts to challenge its majority status." *Id*.

*St. Elizabeth Manor* was not the final word on the successor bar. Three years after the issuance of the decision, the Board again changed its view of the rule, switching back to a rebuttable presumption of majority status for an incumbent union following a successor employer's voluntary recognition. *MV Transp.*, 337 N.L.R.B. 770, 770 (2002). The Board's decision was prompted, in part, by the worry that the successor bar, in conjunction with other bars established under Board precedent, could block challenges to a union's majority status for several years. *See id*. at 773. For example, under the Board's "contract bar" rule, challenges to a union's majority status are precluded for the first three years of a valid collective bargaining agreement. *See Gen. Cable Corp.*, 139 N.L.R.B. 1123, 1125 (1962). This raised the possibility that employees may be prevented from changing their bargaining representative for up to six years if they are subject to a contract bar under their predecessor employer, a successor bar, and then a contract bar again, should the incumbent union reach an agreement with the successor. *MV Transp.*, 337 N.L.R.B. at 773. This prospect, in the Board's view, demonstrated that the successor bar might hamper employee freedom of choice, as guaranteed by Section 7 of the NLRA. *Id*.

Nine years later, the Board overruled *MV Transportation* and readopted the rule that an incumbent union in a successorship situation is entitled to an irrebuttable presumption of majority support for a reasonable period of time following the successor's voluntary recognition of the union. *UGL-UNICCO Serv. Co.*, 357 N.L.R.B. 801, 801 (2011). The Board also defined the "reasonable period" over which the successor bar applied, limiting the period to a minimum of six

months and a maximum of a year. *Id*. at 809. The Board explicitly addressed the *MV Transportation* Board's concern about the consecutive application of the contract bar and successor bar doctrines, modifying the contract bar period to a maximum of 2 years in circumstances where (1) an initial contract is reached by the successor employer and incumbent union within a reasonable period of bargaining, and (2) there was no open period for challenges to the incumbent union's majority status during the final year of the predecessor employer's bargaining relationship with the union. *Id*. at 810. The Board also left for future cases "whether any further refinements in the contract-bar doctrine are appropriate in particular successorship situations." *Id*.

Since *UGL-UNICCO*, the Board has held firm to its interpretation of the successor bar as requiring an irrebuttable presumption of majority status for a reasonable period following a successor employer's voluntary recognition of the union. *See, e.g.*, *Empire Janitorial Sales & Serv., LLC*, 364 N.L.R.B. 1874, 1885 (2016); *Lily Transp. Corp.*, 363 N.L.R.B. 176, 177 (2015), *enf'd*, 853 F.3d 31 (1st Cir. 2017); *Jamestown Fabricated Steel & Supply, Inc.*, 362 N.L.R.B. 1314, 1314 n.1 (2015).

**B. Factual Background**

On September 12, 2017, Petitioner bought the assets of Hospital San Lucas. At the time of Petitioner's purchase, the Union represented five distinct bargaining units of hospital employees: (1) Medical Technologists, (2) Registered Nurses ("RNs"), (3) Licensed Practical Nurses ("LPNs"), (4) Technicians, and (5) Clerical Workers. The Union had represented the Medical Technologists since on or about March 22, 2005, and the RNs and LPNs since on or about August 25, 1998. The collective-bargaining agreements for these three

units expired several years prior to the sale of Hospital San Lucas. The Union had represented the Technicians and Clerical Workers since on or about April 12, 2012, and since on or about May 21, 2012, respectively. No collective-bargaining agreement had ever been reached for either unit.

In early September 2017, before the formal acquisition of Hospital San Lucas, a representative for Petitioner, Pedro Meléndez, informed the Union that Petitioner rejected the terms and conditions established in the expired collective-bargaining agreements between the Union and Hospital San Lucas. He also notified the Union that all union-represented Hospital San Lucas employees had received offers of employment from Petitioner, subject to new terms and conditions of employment. Meléndez told the Union that if a majority of the employees in the bargaining units currently represented by the Union accepted Petitioner's job offers, Petitioner would recognize the Union as the collective-bargaining representative of each of the five units. By September 12, 2017, all employees who had previously worked for Hospital San Lucas, union-represented or otherwise, agreed to work for Petitioner. The next day, Petitioner assumed operation of the hospital. As a result, no new hires were considered. The parties have stipulated that Petitioner qualifies as a successor employer.

On September 13, Union representative Ariel Echevarría requested that Petitioner recognize the Union. He also sought information about the employees who were offered employment. Petitioner's response to the Union was not received for at least a month and was inconclusive.

On September 19, Hurricane Maria hit Puerto Rico. During the disruption caused by the hurricane, Petitioner assigned the RNs to work 12-hour shifts, rather than their

regularly scheduled 8-hour shifts. On October 21, Petitioner restored the RNs' 8-hour shifts, after the Union and Petitioner could not come to an agreement about whether and how to make the shift change permanent.

Petitioner finally recognized the Union by letter on November 6, 2017, and provided its response to some of the Union's September 13 requests for information. At a Thanksgiving lunch on November 22, the hospital administrator gave certificates and $150 bonuses to the employees who worked overnight during Hurricane Maria. Although Petitioner had officially recognized the Union prior to the lunch, it did not inform the Union of its intention to award the certificates or bonuses, nor did Petitioner give the Union an opportunity to bargain over either. Petitioner and the Union engaged in no meaningful collective bargaining after the luncheon. Quite the contrary.

On February 5, 2018, Petitioner informed the Union that it was withdrawing recognition from the Union as the collective bargaining representative of the Technicians unit. The next day, Petitioner met with employees in the Technicians unit to notify them that they were no longer represented by the Union and that they would receive new benefits as non-union employees, including a salary increase, full payment of their health insurances plans, and a uniform incentive. Six days after its withdrawal of recognition, Petitioner increased the Technicians' wages.

On February 7, the Union requested that Petitioner propose dates for bargaining sessions. Petitioner responded the same day, asking the Union to submit proposals for the four units it still represented. Petitioner stated it would be available to negotiate once it had reviewed the Union's proposals. Five

days later, the Union submitted bargaining proposals for all five bargaining units. No bargaining followed, however.

On February 14, Petitioner, claiming the Union's loss of majority status, withdrew recognition from the Union as the collective bargaining representative for the Clerical Workers' unit. As part of its notification to the Union of its withdrawal of recognition, Petitioner also returned the Union's bargaining proposals for the Technicians' and Clerical Workers' units, stating that the Union no longer represented either group. By separate letter on the same day, Petitioner confirmed that it had received the Union's proposals but contended that bargaining could only begin after Petitioner submitted its counterproposals, which it estimated would happen by the third week of April. This proved to be a hollow offer.

On February 16, Petitioner withdrew recognition from the Union as the collective bargaining representative of the Medical Technologists' unit, again claiming that the Union had lost its majority status. On April 6, Petitioner did the same for RN unit. Petitioner also returned the Union's February 12 bargaining proposal for the RN unit, on the grounds that the Union no longer represented the unit**.**

On April 18, Petitioner gave the Union a counter proposal covering employees in the LPN unit. This, too, amounted to a largely meaningless gesture, because six days later Petitioner withdrew recognition from the Union as the collective bargaining representative of the LPN unit.

As Petitioner successively withdrew recognition of the Union and declined to engage in any good faith bargaining, it also made unilateral changes to employees' conditions of employment. Between April and June, Petitioner eliminated the health insurance premium for employees in all five Union-

represented units. On May 18, Petitioner awarded a $200 uniform bonus to employees in the RN and LPN units for the first time. On June 17, Petitioner re-instituted 12-hour shifts for RNs. In late June or early July, Petitioner circulated and put into effect an employee handbook, an employee manual, and a code of conduct, altering disciplinary procedures and employee benefits. The Union was not informed of any of these changes prior to Petitioner's announcements nor was it given the opportunity to bargain over any of these matters.

Along with its withdrawals of recognition and unilateral changes to the employees' conditions of employment, Petitioner failed to respond to the Union's requests for relevant information. On March 14, Petitioner held a meeting with unit employees regarding renewal of their health insurance. That same day, the Union requested copies of all documents signed by employees at the meeting, which included the documents employees signed to renew their health insurance as well as the meeting's attendance sheet. Petitioner responded to the Union's request for information by sending a copy of a document given to RNs and LPNs summarizing their health insurance benefits and a copy of the signed attendance sheets for the RN and LPN units. On April 4, the Union renewed its request for copies of all documents signed at the meeting, asserting that Petitioner had not provided all documents requested. Petitioner never responded to the Union's second request.

## C. Procedural History

Acting on the unfair labor practice charges filed by the Union, the NLRB's General Counsel issued a complaint against Petitioner on July 31, 2018. ALJ Decision at 1. The complaint alleged that Petitioner's conduct violated Sections 8(a)(5) and (1) of the NLRA. *See id.* at 1, 14. An ALJ conducted a hearing and, following consideration of the parties' submissions, issued a decision on May 30, 2019. *Id.* at 1.

The ALJ concluded that, based on the evidence in the record, Petitioner violated the NLRA by: (1) unlawfully withdrawing recognition of the Union as the employees' lawful bargaining agent in five separate units; (2) failing and refusing to bargain in good faith with the Union; (3) unilaterally altering the employees' terms and conditions of employment; and (4) failing to provide the Union with information that was relevant to the Union's duties as the employees' collective-bargaining representative. *Id.* at 14. The ALJ ordered Petitioner to cease and desist from its unfair labor practices and determined that special remedies were necessary given the Petitioner's "pattern of conduct that showed no serious interest in engaging in collective bargaining" and "its imposition of unilateral changes [that] demonstrated a desire to shirk its obligations as a successor employer." *Id.* at 15. The ALJ ordered Petitioner to recognize and bargain with the Union for a reasonable period of at least six months to up to a year, measured from the date of the first bargaining meeting. *Id.* at 16. The ALJ also ordered that these bargaining sessions be held for a minimum of 15 hours a week and required Petitioner to submit written bargaining process reports to an NLRB compliance officer every 30 days. *Id.*

In finding that Petitioner unlawfully withdrew recognition from the Union, the ALJ denied Petitioner's request to present evidence in support of its claim that the Union had lost its majority status in each of the bargaining units. *Id*. at 3. To do so, the ALJ relied on the "successor bar" rule as articulated by the Board in *UGL-UNICCO*. The parties had stipulated that Petitioner was a successor employer and the ALJ accordingly held that *UGL-UNICCO* required Petitioner to have bargained in good faith with the Union for at least six months from the date of its recognition of the Union. *Id.* at 4, 10-11. Because each of Petitioner's actions to withdraw recognition from the Union occurred before the six-month period had elapsed, the ALJ held that Petitioner had unlawfully failed and refused to bargain with the Union. *Id*. at 11.

The ALJ next examined the parties' limited bargaining history. He noted that Petitioner never provided justification for telling the Union that it would take over two months to review the Union's proposals. *Id.* The ALJ additionally observed that the parties never had face-to-face negotiations, even though the Union had requested that the parties meet to bargain. *Id*. The ALJ held that this history, in conjunction with Petitioner's unlawful withdrawals of recognition, "[gave] rise to a strong suspicion that the [employer] had no intention of engaging in meaningful bargaining with the Union." *Id*.

The ALJ further found that Petitioner unlawfully made unilateral changes to employees' terms and conditions of employment. *Id*. at 11-13. In support of this finding, the ALJ noted that Petitioner had acted unilaterally by: (1) giving out Hurricane Maria bonuses; (2) reinstituting 12-hour shifts for RNs on June 17, 2018; (3) granting a wage increase to Technicians on February 11, 2018; (4) eliminating the requirement that unit employees pay a portion of their health insurance premium; (5) granting a $200 uniform bonus for the

first time to RNs and LPNs on May 18, 2018; and (6) distributing and putting into effect an employee manual and general rules of conduct, which made changes in disciplinary rules and benefits for employees in all five units. *Id*. at 13. In addition, the ALJ found that Petitioner had unlawfully refused to provide the Union with presumptively relevant information concerning employees' health insurance. *Id*. at 13-14.

Petitioner filed exceptions with the Board challenging the ALJ's decision. *See Hosp. Menonita*, 371 N.L.R.B. No. 108, at 1. In particular, Petitioner objected to the ALJ's reliance on the successor bar rule and his refusal to consider evidence of the Union's alleged loss of majority status. *Id*. Petitioner requested that the Board overrule *UGL-UNICCO* and replace it with the rule applied in *MV Transportation*, pursuant to which an incumbent union in a successorship situation is entitled only to a rebuttable presumption of majority support. *See id.* at 3.

The Board majority found no merit in Petitioner's exceptions. *Id*. at 7. The Board began by stating that, "[t]he explicit policy of the National Labor Relations Act is to *promote* collective bargaining." *Id*. at 4. It went on to say:

The successor bar . . . is designed to promote collective bargaining when a new employer, the successor, takes over a workplace where employees are already represented by a union. As it did in this case, the new employer is typically free to decide—without the union's participation—which of the predecessor's employees to hire and how to change employees' wages, benefits, and working conditions. In such situations, the incumbent union is in an especially vulnerable position, through no fault of its own. Accordingly, the Board has held, with the Supreme Court's approval, that the policies of the Act are best served by presuming that the union has continuing

> majority support from employees and by requiring the successor employer to recognize and bargain with the union. The successor bar is an extension of this principle . . . .

*Id.* (footnote omitted). Member Ring dissented in part. *Id.* at 10. He did not doubt that Petitioner could not prevail under established law. Rather, he simply argued that the Board should return to the regime under *MV Transportation* pursuant to which the presumption of majority support was rebuttable. In Member Ring's view, the successor bar doctrine is "contrary to Supreme Court precedent and imposes an unwarranted restriction on employees' Section 7 rights." *Id.* at 13.

The Board majority addressed the arguments raised by its dissenting member. Looking to the Board's opinion in *UGL-UNICCO*, the majority noted that every argument raised by the dissent had been "fully considered and rejected" by the Board in *UGL-UNICCO*. *Id.* at 5. The Board also noted that the rates of mergers and acquisitions, which had formed part of the Board's rationale in *UGL-UNICCO*, had increased in the years since *UGL-UNICCO* was decided. *Id.* While "the soundness of the Board's policy choice . . . does not depend on [these economic] developments," this continued pattern demonstrated that the Board was justified in altering its view of the successor bar and "that no economic changes since *UGL-UNICCO* suggest that it is now time to take another look." *Id.* at 6. The Board concluded its analysis by noting that "[t]he facts in this case make crystal clear why the protection of a successor bar is needed and appropriately balances the successor employer's and the employees' interests. . . . It is working, as Congress intended, to promote stable and effective collective bargaining relationships." *Id.* at 7.

Having reaffirmed the validity of the successor bar doctrine, the Board agreed with the ALJ's straightforward application of the rule and largely adopted the ALJ's factual findings and conclusions. *Id*. at 1 & n.2. The Board thus concluded that Petitioner had violated Sections 8(a)(5) and (1) of the NLRA by unlawfully withdrawing recognition from the Union, failing and refusing to bargain with the Union, unilaterally changing the terms and conditions of employment for represented employees, and failing to respond to the Union's requests for information relevant to its bargaining duties. *Id*. at 1.

Petitioner now seeks review of the Board's order. The Board cross-petitions for enforcement of its order.

## II. ANALYSIS

### A. Standard of Review

This court "will uphold a decision of the Board unless it relied upon findings that are not supported by substantial evidence, failed to apply the proper legal standard, or departed from its precedent without providing a reasoned justification for doing so." *E.I. Du Pont De Nemours v. NLRB*, 682 F.3d 65, 67 (D.C. Cir. 2012). When "the Board adopts the ALJ's findings and conclusions as its own, we apply the same deferential standard to those findings and conclusions." *Weigand v. NLRB*, 783 F.3d 889, 895 (D.C. Cir. 2015). This court, however, does not "merely rubber-stamp NLRB decisions." *Avecor, Inc. v. NLRB*, 931 F.2d 924, 928 (D.C. Cir. 1991). Rather, "[i]t is our responsibility to examine carefully both the Board's findings and its reasoning." *Id*. (quoting *Peoples Gas Sys., Inc. v. NLRB*, 629 F.2d 35, 42 (D.C. Cir. 1980)).

## B. The "Successor Bar" Rule

Lest there be any confusion here, we want to make it clear that, in reaching its decision in this case, the Board adhered to established precedent. The Board's decision in *UGL-UNICCO*, which controls the disposition of this case, was issued 13 years ago and has been followed ever since. Petitioner and the dissenting member of the Board appear to suggest that *UGL-UNICCO* is a fragile precedent because the judgment in that case resulted from a change in the Board's policy regarding the successor bar. This is a specious claim.

"Agencies are free to change their existing policies as long as they provide a reasoned explanation for the change." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016). As the Supreme Court has explained, an "agency must show that there are good reasons for [a] new policy. But it need not demonstrate to a court's satisfaction that the reasons for the new policy are better than the reasons for the old one; it suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency believes it to be better, which the conscious change of course adequately indicates." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) (emphasis omitted).

Considered "flexibility and adaptability to changing needs and patterns . . . is an essential part of the office of a regulatory agency." *American Trucking Ass'ns v. Atchison, Topeka & Santa Fe Railway Co.*, 387 U.S. 397, 416 (1967). "Regulatory agencies do not establish rules of conduct to last forever; they are supposed, within the limits of the law and of fair and prudent administration, to adapt their rules and practices to the Nation's needs in a volatile, changing economy." *Id.* Indeed, the Supreme Court has explicitly blessed the NLRB's refusal

to stand by decisions that no longer serve appropriate policy ends: "The use by an administrative agency of the evolutional approach is particularly fitting. To hold that the Board's earlier decisions froze the development of . . . the national labor law would misconceive the nature of administrative decisionmaking." *NLRB v. J. Weingarten, Inc.*, 420 U.S. 251, 265-66 (1975).

Consistent with this mandate, over the years, the NLRB has sometimes overruled precedent and established a new rule after reweighing competing policy considerations. *See, e.g.*, *Stericycle, Inc.*, 372 N.L.R.B. No. 113 (Aug. 2, 2023); *Wendt Corp.*, 372 N.L.R.B. No. 135 (Aug. 26, 2023). So long as the Board provides "a reasoned explanation for the change," such a change poses no serious issue. *See Encino Motorcars*, 579 U.S. at 221; *see also Golden State Bottling Co. v. NLRB*, 414 U.S. 168, 174-76, 181-85 (1973); *C.J. Krehbiel Co. v. NLRB*, 844 F.2d 880, 883 (D.C. Cir. 1988); *Loc. 900, Int'l Union of Elec., Radio & Mach. Workers v. NLRB*, 727 F.2d 1184, 1189 (D.C. Cir. 1984) (enforcing NLRB decisions overruling precedent).

Nothing unusual occurred in 2011 when the Board reversed precedent, adopted its current interpretation of the successor bar, and comprehensively justified its decision in *UGL-UNICCO*. The Board's decision to overrule its previous rule was neither hastily reached nor unthinkingly decided. Rather, the Board reached its decision after issuing a notice and invitation to file briefs, inviting the parties as well as amici to address whether the Board should reconsider *MV Transportation*. *See UGL-UNICCO*, 357 N.L.R.B. at 801. The Board received briefs from the parties, including two intervenors, as well as seven amici on both sides of the issue. *Id.* at 802. The *UGL-UNICCO* Board's full attention was trained on "whether to adhere to *MV Transportation*." *Id.*

Above all, the *UGL-UNICCO* Board provided ample explanation for its decision to overrule *MV Transportation* and adopt the Board's current view of the successor bar rule. In its decision, the Board outlined clear reasons for its view that "labor law's overriding policy" of "preserving industrial peace by promoting stability in collective bargaining relationships, without impairing the free choice of employees" was better served by an irrebuttable presumption than a rebuttable one. *Id*. at 805 (alteration omitted) (footnote and quotations omitted). The Board concluded that, "[a]n insulated period for the union . . . enables the union to focus on bargaining, as opposed to shoring up its support among employees, and to bargain without being under exigent pressure to produce hothouse results or be turned out, pressure that can precipitate a labor dispute and surely does not make reaching agreement easier." *Id*. at 807 (quotations omitted). The Board noted further that "[a]n insulated period also increases the incentives for successor employers to bargain toward an agreement" by disallowing an employer from delaying bargaining as a means of implicitly undermining support for the union. *Id*.

Importantly, the decision in *UGL-UNICCO* explicitly addressed the reasoning in *MV Transportation*, providing a clear account of why the *UGL-UNICCO* Board believed the judgment in that earlier decision was ultimately flawed. First, the Board noted that *MV Transportation* "does not come to terms with the basic fact of the successorship situation: that the *bargaining relationship* is an entirely new one." *Id*. at 806-07. Looking to the Supreme Court's decision in *Fall River Dyeing & Finishing Corp. v. NLRB*, 482 U.S. 27, 40 (1987), the Board noted that, "as the *Fall River* Court recognized, the new relationship will often begin in a context where everything that the union has accomplished in the course of the prior bargaining relationship (including, of course, a contract) is at

risk, if not already eliminated." *Id*. at 807. "This is, emphatically, a new bargaining relationship that should be given a reasonable chance to succeed." *Id*. The Board found implausible *MV Transportation*'s assumption that "the environment of uncertainty and anxiety created by successorship might well make employees *more*, not less, likely to support the union," given that successorship law makes it "very difficult" for an incumbent union to protect the status quo that existed under the predecessor employer. *Id*. (quotation omitted).

Second, the Board rejected *MV Transportation*'s view that insulating a union from a challenge to its status for a reasonable period would heighten instability in the workplace if a union no longer enjoyed majority support. *Id*. Looking to the purposes of the NLRA, the Board determined that the Act "seeks to preserve . . . the stability of the existing collective-bargaining relationship, which an insulated period obviously protects." *Id*. While "[e]mployee support for the union may well fluctuate during the period following successorship . . . such fluctuations in employee sentiment are not inconsistent with stable bargaining so long as employees have a periodic opportunity to change or revisit their representation." *Id*.

*UGL-UNICCO* also addressed the effect of a successor bar on the statutory right of employees to freely choose (or reject) a union. *Id*. at 808. First, the Board acknowledged that "[e]mployee freedom of choice is . . . a bedrock principle of the statute." *Id.* (alterations in original) (quotation omitted). Noting that its previous decisions had left undefined the reasonable time period over which the successor bar operates, the Board sought to specify the bounds of a "reasonable period of bargaining" with an eye to striking the "appropriate[] balance [between] the goals of bargaining stability and the principle of free choice." *Id*. The Board turned to the multifactor analysis it

had outlined in *Lee Lumber & Building Material Corp.*, 334 N.L.R.B. 399 (2001), which defined a reasonable time period of bargaining in the context of remedying an unlawful refusal to recognize and bargain with an incumbent union. *Id*. at 808-09. Drawing on *Lee Lumber*, the Board decided that the reasonable bargaining period applicable to the successor bar was between six months to a year. *Id*. at 809-10. With the outer edges of the successor bar's application limited to one year, the Board determined that the bar did not unduly burden employee freedom of choice. *Id*. at 808.

Petitioner argues that the Board's application of the successor bar rule is unworthy of the deference normally afforded Board decisions, both because the Board precedent supporting the rule is fragile and because the successor bar rule contravenes Section 7 of the NLRA as well as the Supreme Court's decisions in *NLRB v. Burns International Security Services, Inc*., 406 U.S. 272 (1972) and *Fall River Dyeing & Finishing Corp. v. NLRB*, 482 U.S. 27 (1987). Petitioner is wrong on both counts.

Petitioner's first argument is squarely foreclosed by case law from the Supreme Court and this court. Because "the NLRB has the primary responsibility for developing and applying national labor policy," the Supreme Court has required that reviewing courts "accord[] Board rules considerable deference." *Curtin Matheson*, 494 U.S. at 786. This deference stands "even if [a contested Board rule] represents a departure from the Board's prior policy." *Id*. at 787. As we have discussed at length above, an agency is permitted to change its policies so long as it provides a reasoned explanation for doing so. *Encino Motorcars*, 579 U.S. at 221. Here, there is no question that, in *UGL-UNICCO*, the Board permissibly changed its policy by acknowledging that it was overruling existing precedent and by providing a sound

explanation for its decision. Since then, the Board has consistently enforced *UGL-UNICCO*'s successor bar, as it did in the case before us. Because the Board acted reasonably in adopting the successor bar in *UGL-UNICCO*, our normal deference to reasoned Board policy choices applies. *See Stephens Media, LLC v. NLRB*, 677 F.3d 1241, 1250 (D.C. Cir. 2012).

Petitioner's substantive challenges to the successor bar also fail. In the years since *UGL-UNICCO* was issued, only the First Circuit has considered the merits of the Board's successor bar rule. *See NLRB v. Lily Transp. Corp.*, 853 F.3d 31, 38 (1st Cir. 2017). The petitioner in *Lily* raised many of the same arguments Petitioner now urges us to adopt. However, the First Circuit handily upheld the successor bar, seeing "no cause to doubt that the Board's position . . . is within the scope of reasoned interpretation [of the NLRA]." *Id*. Writing for the court, former Associate Justice David Souter described the Board's decision in *UGL-UNICCO* as "an adequately explained interpretive change reflecting the Board's judgment of a reasonable balance between the Section 7 right of employee choice and the need for some period of stability to give the new relationships a chance to settle down." *Id*.

*Lily* rejected without difficulty the argument that the successor bar violates employees' Section 7 rights. *Id.* at 35. The First Circuit noted that the bar lasts only for a limited period – between just six months to a year – and that the bar's "limited discouragement of an unduly hasty reexamination of a prior Section 7 choice serves . . . [the NLRA's] 'underlying purpose.'" *Id*. at 35-36 (quoting *Brooks v. NLRB*, 348 U.S. 96, 103 (1954)). Moreover, the decision in *Lily* tellingly notes that it is not even clear that a rebuttable presumption would be obviously more effective than an irrebuttable presumption in securing employees' bargaining rights. *Id*. at 35. A rebuttable

presumption could ultimately become "more onerous" than the successor bar, given the "added burden of rebuttal . . . which could increase litigation time and expense." *Id*. Indeed, the case before us amplifies the point. Petitioner's attempt to force the adoption of a rebuttable presumption has prolonged the length of the controversy and generated considerable litigation expense. Given that *both* the successor bar and a rebuttable presumption further "the obviously legitimate objective of stability in labor and management relations during a period in which the entrance of new management can destroy the prior modus operandi among union, employer, and employees," a choice between the two approaches should bow to reasoned Board decisionmaking. *Id*.

The First Circuit also easily dispensed with the suggestion that *UGL-UNICCO* is contrary to *Burns* and *Fall River*. Although both cases refer to a rebuttable presumption of majority status for incumbent unions, *see Burns*, 406 U.S. at 278-79, 279 n.3; *Fall River*, 482 U.S. at 41 & n.8, the First Circuit found that the Supreme Court's language in those cases "simply describes the legal landscape at the time." *Lily*, 853 F.3d at 38-39. "Neither case holds that a rebuttable presumption, rather than a bar, is required in a successorship situation." *Id*. at 39.

We can find no reason to disagree with the First Circuit's analysis. As former Justice Souter reminds us in *Lily*, the Board is entitled to deference when it has thoroughly and reasonably justified a change in policy. *Id*. at 38. It is not the role of the court to second-guess the Board in such matters.

We do not purport to decide the permissible outer limits of the successor bar rule – a question the Board itself left open for further refinement in *UGL-UNICCO*. *See* 357 N.L.R.B. at 810. Nor is there any need for us to do this. The Board reasonably

applied established precedent to find an employer liable for unfair labor practices. We are, therefore, bound to enforce the Board's decision. *See Avecor*, 931 F.2d at 928 ("We owe substantial deference to . . . the reasoned exercise of [the Board's] expert judgment . . . .") (alteration in original) (quotation omitted). Petitioner concedes it is a successor employer, and it voluntarily opted to retain all its predecessor's employees. At the time when the hospital was acquired, Petitioner knew that many of its new employees were represented by a union and that, under established law, it was obliged to bargain in good faith with their union for a period ranging from six months to a year. Instead of abiding by settled law, Petitioner first recognized the Union and then blocked all efforts by the Union to pursue collective bargaining. As the ALJ and Board found, Petitioner failed and refused to bargain with the Union over the terms of initial collective-bargaining agreements, unlawfully withdrew recognition from the Union, unilaterally changed the terms and conditions of employment of union-represented employees, and refused to furnish relevant information to the Union when requested.

Six years have now passed since Petitioner started stonewalling the Union. Had Petitioner followed the law, this matter would have been resolved long ago and without protracted litigation. The bargaining parties might have decided upon a mutually acceptable collective bargaining agreement or the employees might have opted to leave the union if good faith bargaining failed. Neither a contract bar nor any other bar doctrine would have been in play. Given the record before us, it is clear that the Board applied established precedent to a case that fell easily within the compass of the successor bar rule.

### C. Other Matters Raised by Petitioner

In addition to challenging the successor bar doctrine, Petitioner raises a number of other issues, arguing that the Board erred in its specific findings of unfair labor practices and in its imposition of special remedies. None of these arguments succeed. Petitioner did not properly preserve many of the arguments it now presents, either by including the claims in its exceptions to the Board regarding the ALJ's decision or by moving for reconsideration of the Board's decision. 29 U.S.C. § 160(e); *see, e.g.*, *Flying Food Group Inc. v. NLRB*, 471 F.3d 178, 185-86 (D.C. Cir. 2006) ("Whatever the merits of [Petitioner's] argument, we are barred from considering it because the company never presented it to the Board."). Petitioner also lists several issues in its brief without adequately amplifying its claims. These are matters that we do not consider. *Bode & Grenier, LLP v. Knight*, 808 F.3d 852, 861 (D.C. Cir. 2015) ("Simply listing the issues on review without briefing them does not preserve them.") (quotation omitted).

Petitioner's remaining arguments fail under the relevant standard of review. The Board's legal findings are supported by substantial evidence, and the Board properly exercised its discretionary authority to impose remedies as it deemed appropriate. 29 U.S.C. § 160(c); *Fallbrook Hosp. Corp. v. NLRB*, 785 F.3d 729, 738, (D.C. Cir. 2015) ("[T]he court has no business second-guessing the Board's judgments regarding remedies for unfair labor practices.").

### III.    CONCLUSION

For the reasons set forth above, we deny the petition for review and grant the Board's cross-application for enforcement.

KATSAS, *Circuit Judge*, concurring: When one employer succeeds to the collective-bargaining obligations of another, should the successor be barred for some time from challenging the majority status of an incumbent union? The National Labor Relations Board has taken shifting positions on this question. The Board declined to impose a successor bar in 1975, imposed one in 1981, abandoned it in 1985, imposed a different bar in 1999, abandoned it in 2002, and imposed yet a third bar in 2011. *Ante* at 7–9. In doing so, the Board focused on policy questions about how best to foster collective bargaining while still ensuring ongoing employee support for incumbent unions. The Board was more terse, however, in addressing what the governing statute has to say about this question.

In my view, there is a plausible argument that the National Labor Relations Act prohibits a successor bar. Section 7 gives employees the right to bargain collectively "through representatives of their own choosing" or to refrain from such bargaining. 29 U.S.C. § 157. Section 8 makes it an unfair labor practice for employers to interfere with this right or refuse to bargain collectively with a union, subject to section 9(a). *Id.* § 158(a)(1), (5). Section 9(a) requires unions to be chosen by a majority of employees within the relevant bargaining unit. *Id.* § 159(a). Section 9(c) permits claims that a union no longer commands majority support. *Id.* § 159(c)(1)(A)(ii). It also sets forth one—and only one—time bar for challenges to the continuing support of a previously certified union, which runs for one year after any valid election. *Id.* § 159(c)(3); *see also id.* § 159(e)(2). Under normal principles of statutory construction, the express imposition of that time bar may preclude, by negative implication, the imposition of others. *See*, *e.g.*, *Leatherman v. Tarrant Cnty. Narcotics Intel. & Coordination Unit*, 507 U.S. 163, 168 (1993); A. Scalia & B. Garner, *Reading Law: The Interpretation of Legal Texts* 107–11 (2012).

On the other hand, our governing standard of review is deferential. Under current Supreme Court precedent, we must apply the familiar *Chevron* framework when reviewing NLRA interpretations rendered by the Board in unfair-labor-practice adjudications. *E.g.*, *Lechmere, Inc. v. NLRB*, 502 U.S. 527, 536 (1992); *UC Health v. NLRB*, 803 F.3d 669, 673–74 (D.C. Cir. 2015). So, we consider whether Congress spoke "directly" to the question presented and, if not, whether the agency adopted a "reasonable" interpretation of the governing statute. *Chevron U.S.A. Inc. v. NRDC, Inc.*, 467 U.S. 837, 842–44 (1984). Of course, the Supreme Court has declined to apply *Chevron* in many recent cases and is now considering whether to overrule it. *Loper Bright Enters. v. Raimondo*, U.S. No. 22-451; *Relentless, Inc. v. Dep't of Com.*, U.S. No. 22-1219. But until that Court instructs otherwise, we remain bound to apply *Chevron*. *See Agostini v. Felton*, 521 U.S. 203, 237–38 (1997).

Under *Chevron*, the Court's decision seems to me correct. As noted above, the statutory bar on challenges to the continuing support for a union, which is keyed to elections and runs for one year, may preclude the Board from imposing other bars with different lengths or triggers. But many of our cases have rejected application of the negative-implication canon to foreclose agency interpretations that would otherwise be reasonable under *Chevron*. Specifically, we have said that the canon is "an especially feeble helper in an administrative setting, where Congress is presumed to have left to reasonable agency discretion questions that it has not directly resolved." *Cheney R.R. v. ICC*, 902 F.2d 66, 69 (D.C. Cir. 1990) (citing *Chevron*, 467 U.S. at 843–44); *see also Loper Bright Enters. v. Raimondo*, 45 F.4th 359, 366–67 (D.C. Cir. 2022), *cert. granted*, 143 S. Ct. 2429 (2023); *Adirondack Med. Ctr. v. Sebelius*, 740 F.3d 692, 696–97 (D.C. Cir. 2014); *Mobile Commc'ns Corp. of Am. v. FCC*, 77 F.3d 1399, 1404–05 (D.C. Cir. 1996). And without any compelled negative implication

from the statutory time bar, the Board could reasonably conclude that its current successor bar, which runs for six months to one year depending on the circumstances, does not by itself frustrate employees' section 7 rights to bargain "through representatives of their own choosing." Accordingly, I agree with my colleagues and the First Circuit that the current successor bar "is within the scope of reasoned interpretation and thus subject to judicial deference under *Chevron*." *NLRB v. Lily Transp. Corp.*, 853 F.3d 31, 38 (1st Cir. 2017); *see ante* at 24–25. In so doing, I take no position on whether the bar would survive under *de novo* review in a post-*Chevron* world. I also agree with my colleagues that the Board has adequately explained the policy justifications driving its interpretive choice.